In the
United States Court of Appeals
For the Seventh Circuit

No. 01-3612

United States of America,

Plaintiff-Appellee,

v.

Aaron L. French,

Defendant-Appellant.

Appeal from the United States District Court
for the Central District of Illinois.
No. CR 00-20032-01--Michael P. McCuskey, Judge.

Argued February 19, 2002--Decided May 28, 2002


   Before Coffey, Easterbrook, and Diane P.
Wood, Circuit Judges.

   Coffey, Circuit Judge.  Probation Officer
Steve Kelly came to Aaron French's
property in Humboldt, Illinois, in search
of Richard Hensley, a delinquent
probationer. While searching for Hensley,
Kelly observed evidence of a
methamphetamine lab upon Aaron French's
property. Kelly notified Illinois law
enforcement officers who obtained a
search warrant and discovered a
methamphetamine lab as well as
unregistered weapons in a shed on the
property. French was charged by a grand
jury sitting in the Central District of
Illinois in a six-count indictment with
various drug- and gun-related offenses.
French filed a motion to suppress and
argued that the evidence seized from the
shed be suppressed because the law
enforcement officers obtained the search
warrant based upon information that Kelly
had obtained in violation of French's
Fourth Amendment rights. According to
French's argument, Probation Officer
Kelly made his observations of the
methamphetamine lab from within the
curtilage of French's residence, thereby
conducting an illegal search. The trial
court denied French's motion to suppress,
ruling that Kelly was not within the
curtilage of French's home when he
observed the methamphetamine lab. French
later pleaded guilty, but reserved his
right to appeal the trial court's adverse

determination of his motion to suppress.
French appeals that determination. We
affirm.

I.  Factual Background

On November 22, 1999, Probation Officer
Steve Kelly went to Aaron French's
property in Humboldt, Illinois, in an
attempt to locate Hensley, his
probationer. Kelly had previously been
assigned to Hensley's case as his
probation officer, but for three months
Hensley had failed to report to Kelly as
the conditions of his probation required,
and Kelly's attempts to locate Hensley up
to that point had been unsuccessful. But
on that day, Hensley's mother and sister
informed Kelly that Hensley often worked
at defendant-appellant French's residence
as a vehicle mechanic. After learning
that Hensley might be working on French's
property, Kelly drove to French's
Humboldt property, accompanied by two
additional probation officers, Vicki
Starwalt (Kelly's supervisor) and Jana
Pamperin, in search of Hensley.

When he arrived at French's residence,
Kelly pulled onto an open gravel
driveway. There were neither gates, nor
fences, nor barricades obstructing or
otherwise preventing the public from
entering upon the driveway from the
public road, nor were there any "no
trespassing" signs posted on or around
the drive. The structures on the
defendant-appellant French's property,
which were in plain view, consisted of a
mobile home or trailer, which French used
as a residence, a shed connected to a
"lean-to," a three-sided structure that
was partially covered by a shredded tarp
on the one open side (serving as a
curtain to hide the interior from view),
and a second shed. The shed and lean-to
were located at the south end of the
drive, opposite the trailer, and faced
west. The trailer faced the shed and
lean-to structure and a gravel walkway
approximately 20 feet in length connected
the two structures. A second gravel
walkway connected the trailer and the
second shed, located in the southwest
corner of the property. A brick and
gravel walkway led from the drive to the
front door of the trailer.

Kelly parked in the gravel drive, thirty
to forty feet from the shed. His

accompanying officers, Starwalt and Pamperin, remained in the car while Kelly exited the vehicle in order that he might locate and speak with Hensley. Upon exiting his vehicle, Kelly observed a person working on a vehicle at the south end of the drive approximately five (5) feet from the shed and lean-to, but Kelly was unable to see him clearly as the hood of another vehicle obstructed his view. Having been informed that Hensley might be working as a mechanic at the French property, Kelly decided to approach this person (rather than proceed directly to the front door of the trailer) to determine whether the person was the probationer, Hensley. As Kelly approached the unidentified person working on the vehicle, he also observed another individual whom he recognized as probationer Kevin Morlan run from the lean-to into the adjoining shed, which was unlocked at the time. Kelly had encountered Morlan but two weeks earlier at another location during a search of a methamphetamine lab where a .45 caliber automatic pistol was confiscated. Kelly immediately became suspicious of Morlan's behavior and decided that in order to ensure his safety he would order Morlan to exit the shed before he attempted to question the individual working at the parked vehicle. Using the gravel walkway that connected the trailer and the shed, Kelly approached the open entrance of the shed where Morlan had entered. As Kelly approached, he noticed through the open door that Morlan had placed his hands inside his pants pockets and thus ordered Morlan to remove his hands from his pockets and to exit the shed. Morlan complied in part, exiting the shed, but continued to conceal his hands in his pockets. Kelly noticed a rifle located on a bench inside the shed from his vantage point on the walkway. Kelly escorted Morlan to his car and upon searching him found two shotgun shells and a .44 magnum shell on Morlan's person. Morlan remained uncooperative and refused to answer any questions regarding the whereabouts of Hensley. Because of the potentially dangerous situation, Kelly asked his supervisory officer, Starwalt, to call for assistance.

After patting down and restraining Morlan, Kelly observed another individual slumped over inside a second vehicle parked on French's driveway. As Kelly

approached the car, he noticed that this person (later identified as Eric Collins) also had his hands in his pockets. When Collins removed his hands, Kelly heard a "pop," which he soon learned was the sound of a light bulb breaking in Collins's pocket. Collins admitted that he had used the lightbulb to smoke methamphetamine and, upon Kelly's request, consented to a search of his vehicle.

Shortly after Collins admitted to having been smoking methamphetamine, two police officers and a state trooper arrived and Kelly briefed them on the situation. Having secured both Morlan and Collins, Kelly returned to question the individual who had continued to work on the vehicle parked near the shed. Kelly approached the unidentified person repairing the vehicle, and the individual identified himself as Nicholas Jordan. Kelly asked Jordan whether he had seen Richard Hensley, and Jordan denied having seen him. As Kelly questioned Jordan, he detected a strong odor of ether emanating from the shed, approximately five feet away. When Kelly turned toward the shed, the door of which was still open after his earlier encounter with Morlan, he was able to view the inside of the shed and observed fuel cans, glassware, and tubing, all used in the manufacture of methamphetamine. Kelly never entered the shed, nor the lean-to.

Kelly reported his observation to the law enforcement officers who were still present in response to Starwalt's previous call for assistance. Based on Kelly's observations, the officers approached the trailer to further investigate the possibility that the property might shelter a methamphetamine lab. French's wife, Brandy French, gave the officers consent to search the trailer, but told them she did not have access to the shed. The officers searched the trailer and secured the area around the shed and shortly thereafter obtained a search warrant for the purpose of searching the shed for evidence related to a methamphetamine lab. During the ensuing search, the law enforcement officers discovered and seized illegal firearms as well as items used in the manufacturing and processing of methamphetamine. Kelly left the scene shortly after the law enforcement officers obtained the warrant, having

failed to locate probationer Hensley.

Several months later on April 4, 2000, Kelly returned to French's property once again looking for his parolee, Hensley (who had served a jail sentence for his November 1999 failure to report to Kelly and upon release had remained A.W.O.L. in failing to report as required). When Kelly arrived at the property, he observed two men walking from the trailer to the shed. Kelly walked up the gravel walkway to the shed and asked the person inside to come out. Eventually, Ricky Bell, who later became a co-defendant of French, exited the shed. As Bell emerged, Kelly became aware of a strong chemical odor emanating from the shed and was able to observe items used in the manufacture of methamphetamine inside the shed. Illinois drug agents were called to the scene and obtained defendant French's verbal and written consent to search the trailer, shed and lean-to. During the search, agents once again found drug paraphernalia used in the manufacture of methamphetamine as well as illegal firearms.

On June 9, 2000, a grand jury sitting in the Central District of Illinois charged French in a six-count indictment with two counts of the attempted manufacture of methamphetamine in violation of 21 U.S.C. sec. 841(a)(1) and sec. 846, possession of a firearm in furtherance of a drug trafficking offense, 18 U.S.C. sec. 924(c), two counts of possession of a firearm with an obliterated serial number, 18 U.S.C. sec. 922(k), as well as possession of an unregistered short-barreled shotgun, 26 U.S.C. sec. 5861(d). A superseding indictment charged French with the six counts recited above as well as an additional count of conspiracy to manufacture and distribute methamphetamine, 21 U.S.C. sec. 846.

On August 23, 2000, French moved to suppress the evidence seized during the November 22, 1999, and April 4, 2000, searches, alleging that Probation Officer Kelly invaded the curtilage of his home for the purpose of determining the existence of the methamphetamine lab and thus violated the Fourth Amendment prohibition against warrantless searches. During a three-day hearing on French's motion to suppress held on various days in September and October 2000, French

presented ten witnesses who testified in support of his theory that Kelly's observations were made from within the curtilage of French's property and thus violated the Fourth Amendment. On the other hand, the government offered the testimony of Probation Officers Kelly and Starwalt who testified that Kelly neither entered the shed nor the lean-to but instead merely made observations from outside the shed while he stood on the gravel drive and walkway of the French property. The trial court made extensive findings of fact and credibility determinations, and found that the general public had access to both the gravel drive and the walkway and that there were no barriers, obstructions or "no trespassing" signs to limit the public's access to the drive and walkway. The trial judge further found that the drive and walkway were not related to the intimate activities of the French home. The trial court also ruled that the drive and walkway were located outside the curtilage of the home. Because the trial judge found that Kelly was on the property for the legitimate purpose of searching for his errant probationer Hensley, restricting his movement on the property to an area where the public would be expected to enter and making his observations based upon what was within his plain view and smell, he concluded that no unreasonable search had occurred and denied French's motion to suppress the evidence collected during the November 22, 1999, and April 4, 2000, searches.

After the trial court ruled against French on his motion to suppress, French entered into a written plea agreement with the government and pleaded guilty to one count of attempting to manufacture methamphetamine, 21 U.S.C. sec.sec. 841(a) & 846, and one count of possession a firearm in furtherance of a drug trafficking offense, 18 U.S.C. sec. 924(c). In the plea agreement, French reserved the right to appeal the trial court's denial of his motion to suppress evidence.

II.  Issue

On appeal, French argues that the gravel walkway from which Kelly made his observations was within the curtilage of his residence and entitled to protection

from unreasonable searches and seizures under the Fourth Amendment to the United States Constitution./1

III. Analysis

We review a trial court's findings of fact in a suppression hearing for clear error and its conclusions of law and mixed questions of law and fact de novo. United States v. Meyer, 157 F.3d 1067, 1079 (7th Cir. 1998). A factual finding is clearly erroneous "when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been made." United States v. Gravens, 129 F.3d 974, 978 (7th Cir. 1997). Because the resolution of a motion to suppress is necessarily fact-specific, reviewing courts give special deference to the trial court that heard the testimony and had the best opportunity to observe the witnesses at the suppression hearing. Id. "We do not second-guess the [trial] judge's credibility determinations because he or she has had the best opportunity to observe the verbal and nonverbal behavior of the witnesses focusing on the subject's reactions and responses to the interrogatories, their facial expressions, attitudes, tone of voice, eye contact, posture and body movements, as well as confused or nervous speech patterns in contrast with merely looking at the cold pages of an appellate record." United States v. Mancillas, 183 F.3d 682, 701 n.22 (1999).

In addition, a defendant objecting to the search of a particular area bears the burden of proving a legitimate expectation of privacy in the area searched. United States v. Ruth, 65 F.3d 599, 604 (7th Cir. 1995) (citing United States v. Duprey, 895 F.2d 303, 309 (7th Cir. 1989)). A reasonable expectation of privacy exists when "'(1) the complainant exhibits an actual (subjective) expectation of privacy and, (2) the expectation is one that society is prepared to recognize as reasonable.'" Id. (quoting United States v. Myers, 46 F.3d 668, 669 (7th Cir. 1995).

French argues that he had a reasonable expectation of privacy in the gravel walkway from which Kelly made his observations of the methamphetamine lab

because it was within the curtilage of his home. The Fourth Amendment protects individuals from unreasonable searches and seizures. This protection is not limited to the four walls of one's home, but extends to the curtilage of the home as well. See Siebert v. Severino, 256 F.3d 648, 653-54 (7th Cir. 2001). The home's curtilage encompasses "the area outside the home itself but so close to and intimately connected with the home and the activities that normally go on there that it can reasonably be considered part of the home." Id. At common law, the curtilage is the area that encompasses the intimate activities associated with the sanctity of the home and the privacies of life. United States v. Hedrick, 922 F.2d 396, 398 (7th Cir. 1991).

A curtilage line is not necessarily the property line, nor can it be located merely by measuring the distance separating the home and the area searched. United States v. Redmon, 138 F.3d 1109, 1112 (7th Cir. 1998) (en banc). Instead, a home's "curtilage" is the area outside the home itself but so close to and intimately connected with the home and the activities that normally go on there that it can reasonably be considered part of the home. United States v. Pace, 898 F.2d 1218, 1228 (7th Cir. 1990). For example, a barn located sixty feet from a home, which is kept locked and inaccessible to the general public, may be within a home's curtilage, see Severino, 256 F.3d at 654, but garbage placed in a garbage can that abuts the home is not, see United States v. Shanks, 97 F.3d 977, 979 (7th Cir. 1996). Thus whether an area is within a house's curtilage depends not only on proximity to the house but also on the use of the area and efforts to shield it from public view and access as well as the nature for which it is used. United States v. Dunn, 480 U.S. 294, 302-03 (1987).

The Supreme Court announced a four-factor inquiry to determine whether an area is within the curtilage of a home:

[1] the proximity of the area claimed to be curtilage to the home, [2] whether the area is included within an enclosure surrounding the home, [3] the nature of the uses to which the area is put, and [4] the steps taken by the resident to

protect the area from observation by people passing by.

Id. at 334-35.

In applying the factors announced in Dunn, the trial court found that the walkway was not within an enclosed area surrounding the trailer and that French had failed to take any steps to protect the area from observation by passersby, much less preventing the general public from making use of the area to engage in the hobby of automotive repair. The trial court further found that the walkway was not so intimately related to the activities of the home itself that it would be recognized as placed under the umbrella of Fourth Amendment protection. Accordingly, the trial court ruled that the gravel walkway fell outside the home's curtilage and that Probation Officer Kelly's observations were not made in violation of the Fourth Amendment. We agree.

French advances several unconvincing theories in his argument that the gravel walkway, from which Probation Officer Kelly made his observations of the shed and lean-to structures, was within the curtilage of French's home. Initially, French argues that because the walkway was within twenty feet of the home it therefore was of sufficient proximity to the home to be within its curtilage. French next quibbles with the trial court's findings that he failed to take steps to protect the area from observation by the public and argues that the public did not have access to drive. Finally, French argues that the walkway was used for a purpose consistent with home-life, and therefore should be considered to be within the curtilage of the home.

French's argument that the walkway's proximity to the home gives rise to an expectation of privacy is unconvincing. The shed and lean-to were located approximately twenty feet from the residence and the walkway connected the two structures. While it is true that we have found that privacy expectations are most heightened when the area in question is nearer (within 20 feet) to the home, the proximity to the home, standing by itself, does not per se, suffice to establish an area as within the

curtilage. Oliver v. United States, 466 U.S. 170, 182 n.12; Hedrick, 922 F.2d at 399. A curtilage line "cannot be located merely by taking measurements from some other case or precedent and then by use of a tape measure trying to determine where the curtilage is in a different case." Redmon, 138 F.3d at 1112 (en banc). Accordingly, while the proximity of the walkway to the house may be a factor to be considered in deciding whether it is within the home's curtilage, it is but one of several factors to be applied. Dunn, 480 U.S. at 334-35.

French next advances two arguments in support of his position that the trial court erred in concluding that he failed to take steps to prevent the public from observing the walkway, shed and lean-to. First, French argues that the walkway was part of his "backyard," and thus entitled to the presumption that it was within the curtilage. But French's self-serving definition of a "backyard" is not convincing. Contrary to French's assertion, the gravel walkway had none of the characteristics of a backyard. The walkway was neither enclosed nor shielded from the public in any way. The probation officers testified (and the trial court found their testimony to be credible) that here were no gates, barriers, or "no trespassing" signs that prevented people from viewing and using the gravel walkway./2 Further, from Kelly's point of view, several members of the public had access to the walkway, and were using it freely on the occasions when he was present on the property. Indeed when Kelly arrived there were no less than three (3) persons on French's property: Nicholas Jordan worked on a vehicle, Kevin Morlan made use of the shed and lean-to, and Eric Collins sat in a parked vehicle smoking methamphetamine. Additionally, the trial court found that the clutter of car parts and maintenance equipment on and around the drive and walkway was further evidence that the public had access to and frequently used the walkway. As such, it was apparent to Kelly that the walkway was much more like a sidewalk or gravel path that allowed the public to access the front door as well as the shed and lean-to without tramping on the property owner's grass, than an essential component of a private backyard.

French also quarrels with the trial court's finding that the general public had access to the walkway to work onautomotive vehicles. We disagree. In the past we have held that public drives, sidewalks, or walkways (even those which lead to a rear side door) are not within the curtilage of the home when they are not enclosed by a gate or fence. See, e.g., United States v. Evans, 27 F.3d 1219 (7th Cir. 1994) (FBI agent who had plain view of the interior of defendant's home from the defendant's driveway had not made his observation from within the home's curtilage); see also United States v. Smith, 783 F.2d 648 (6th Cir. 1986) (officer who drove 70 feet up a private drive and observed marijuana plants two feet away from defendant's house did not violate the home's curtilage); United States v. Ventli, 678 F.2d 63 (8th Cir. 1982) (officer who photographed tire tracks on private driveway and around the front porch of a rural home did not invade the home's curtilage). In Evans we noted that "'it is not objectionable for an officer to come upon that part of [private] property which has been opened to public common use. The route which any visitor or delivery man would use is not private in the Forth Amendment sense, and thus if police take that route for the purpose of making a general inquiry or for some other legitimate reason, they are free to keep their eyes open.'" Evans, 27 F.3d at 1229 (quoting 1 W. LaFave, Search and Seizure sec. 2.3(e), at 407 (1987)) (internal quotations omitted).

In this case, French failed to produce any evidence that his driveway and/or gravel walkway were hidden from public view, inaccessible, or otherwise used for intimate activity. Nothing about the walkway alerted Kelly that French had closed the walkway to the public in order to engage in private activities and that curious neighbors, members of the public, and government agents should keep out. Indeed quite the opposite appeared to be the case, as Kelly observed at least three members of the public (Morlan, Jordan, and Collins) making use of French's driveway and walkway. Thus, we agree with the trial court that the public did have access to the gravel walkway and that French failed to take any steps to prevent the public from accessing it.

This is not a case where an overzealous law enforcement officer, without a warrant, intending to search for illegal activity ransacked every nook and cranny of French's yard. Nor is it a case where a government agent snooped into areas that he reasonably believed to be private in hopes of uncovering evidence of a crime. Instead, it is clear from the facts in the record that Kelly came to French's property not to conduct a search, but for the express purpose of locating an errant probationer who had failed to report as ordered on numerous occasions. "Probation officers are the intermediary between the judicial system and those who are released into society, but remain under its supervision. Among other things, the probation officer directly supervises the probationers [and] keeps the courts informed of developments in each case . . . ." Jefferson v. Ambroz, 90 F.3d 1291, 1297 (7th Cir. 1996). Kelly had a good-faith belief that his probationer was on the French property and working on an automotive vehicle on the property, and he entered the premises in hopes of finding him in order that he might carry out his supervisory duties.

As noted above, it is not objectionable for an officer to come upon that part of private property opened for public common use and the officer may use the "route which any visitor to a residence would use . . . for the purpose of making a general inquiry or for some other legitimate reason." Evans, 27 F.3d at 1229. It is common sense that, upon entering French's drive and seeing a person working on a vehicle at the end of the drive near the gravel walkway, that Kelly would approach this person rather than approach the front door to the trailer. Probation Officer Kelly entered the French property through the public drive for the legitimate purpose of making a general inquiry of those people who were in plain view and he was free to keep his eyes open during his inquiry. At all times, Kelly confined his actions to those areas on French's property where it was reasonable and necessary to carry out his objective of locating Hensley, the probationer who had been successful in eluding him.

Finally, French also argues that the

trial court committed error in holding that French failed to use the gravel walkway for a purpose connected to the intimate activities of his home. French contends that because the walkway was used in furtherance of his hobby of automotive repair, it was connected to the "intimate activities of the home" and thus within the curtilage of the home. In support, French suggests that the tools for this hobby were stored in his yard and in the shed and lean-to and that the gravel walkway furthered or somehow advanced his hobby of automotive repair. But the only purpose of the walkway was to connect the trailer to the shed, lean-to and gravel drive. French has failed to point to a scintilla of evidence to demonstrate that the walkway, in any way, harbored "the intimate activity associated with the sanctity of a man's home and the privacies of life." Dunn, 480 U.S. at 334.

We agree with the trial court that the walkway from which Kelly made his observations was not within the curtilage of French's home and that French had no legitimate expectation of privacy in the walkway. French failed to take any steps to prevent the public from accessing the walkway area. It was reasonable for Kelly to assume, based upon the number of persons freely using the walkway and gravel drive as well as the clutter around it, that French had no reasonable expectation of privacy in the driveway and gravel walkways. French's conviction and sentence are AFFIRMED.

FOOTNOTES

/1 French also argues that the exclusionary rule should apply where law enforcement officers obtain a search warrant by relying on information provided by probation officers. Based upon the record before us as well as the trial court's ruling on French's motion to suppress, we hold that Probation Officer Kelly was not within the curtilage of the French home (and therefore committed no Fourth Amendment violation) when he made his observations. Thus we need not address this issue in the opinion.

/2 French argues that a partition, approximately four feet high and five feet in length obscured any view of the interior of the shed and lean-to from the gravel drive. The trial court, however, found credible Probation Officers Kelly and Starwalt's testimony that no such partition

existed at the time of the relevant searches. French makes no attempt to show that the trial court's factual finding on this matter was clearly erroneous. Further, even had the trial court found that such a partition existed, it would have been relevant only to whether the shed and lean-to were within the curtilage of the home and not to whether the gravel walkway, from which Officer Kelly made his observations, was within the curtilage of the home. As we observed previously, the trial court's credibility determinations are given special deference for the trial judge heard the testimony and observed the witnesses at the suppression hearing. Gravens, 129 F.3d at 978.