NONPRECEDENTIAL DISPOSITION
To be cited only in accordance with
Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Submitted July 15, 2009[*]
Decided July 28, 2009

**Before**

RICHARD D. CUDAHY, *Circuit Judge*

DIANE P. WOOD, *Circuit Judge*

JOHN DANIEL TINDER, *Circuit Judge*

No. 08-3872

| | |
|---|---|
| DAVID W. NAIL,<br>    *Plaintiff-Appellant*, | Appeal from the United States District Court for the Northern District of Indiana, Fort Wayne Division. |
|     *v.* | |
| | No. 1:06-CV-292-PPS |
| J.C. GUTIERREZ, et al.,<br>    *Defendants-Appellees*. | Philip P. Simon,<br>*Judge*. |

**O R D E R**

After police officers in Fort Wayne, Indiana, arrested David Nail for domestic battery, he sued the arresting officers and the chief of police under 42 U.S.C. § 1983, claiming that the two officers violated the Fourth Amendment and that the police

---

[*]After examining the briefs and the record, we have concluded that oral argument is unnecessary. Thus, the appeal is submitted on the briefs and the record. *See* FED. R. APP. P. 34(a)(2).

department had failed to adequately train them. The district court granted summary judgment in favor of the defendants. Nail now appeals.

The facts are largely undisputed. On the evening of October 1, 2004, Nail engaged in a heated argument with his then-wife, Pamela Olmstead. The dispute ended when Nail hit Olmstead and she called 911 but hung up without saying anything. It was too late, though, because the 911 call center had traced the call to Nail's home and Officers Gutierrez and Cutler had already been dispatched to the scene. When they arrived, Nail stated that Olmstead had meant to dial information (he admits this was a lie); the officers, skeptical, asked to speak with her. Nail then disappeared inside the house, and a few moments later, when Olmstead had not appeared, the officers heard the back door slam. Worried that Nail was fleeing and concerned for Olmstead's safety, Gutierrez left Cutler on the front porch, walked down a path at the side of the house, opened a latched gate, and entered the back yard, where he saw Nail sitting on the porch, smoking a cigarette.

Gutierrez approached Nail, and, smelling alcohol on his breath, asked him to explain the evening's events. Instead of answering, though, Nail asked Gutierrez why he was there. Nail then stood up and said he was returning to the house to get another cigarette, but Gutierrez pushed him back into his chair and told him he was not going anywhere. The two men began to argue, and, hearing the dispute, Olmstead entered the yard from the house while Cutler left the front porch and walked around to the yard. Olmstead told the officers that Nail had hit her. Cutler, with Olmstead's consent, accompanied her into the house so he could speak with her privately, while Gutierrez resumed his questioning of Nail. Nail attempted to leave several times, and each time Gutierrez again pushed him back into the chair. Nail then asked if he was under arrest, and Gutierrez replied that he would handcuff Nail if he tried to get up again. At that point, Cutler and Olmstead returned to the back yard, and Cutler informed Nail that he was under arrest for domestic battery.

Nail, fed up, suddenly lunged at Gutierrez and tried to shove him, though he missed. Cutler then joined the fray, during which Nail attempted to pin the officers to the ground while they tried to handcuff him. According to Nail, both officers kicked and hit him, Cutler struck him with a baton, and one of the officers sprayed pepper spray in his eyes. The officers largely corroborated this version of events: they acknowledged applying a "stun strike" to Nail's face, administering two bursts of pepper spray, and striking Nail's thigh three times in an attempt to subdue him. Finally, the officers succeeded in handcuffing Nail and gave him some water to rinse the spray from his eyes. The officers also took Nail to a hospital to treat the chemical exposure to his eyes. Although Nail avers that he was covered with bruises, there is no evidence that the hospital treated him for any other injuries.

After Nail was released from the hospital, the officers charged him with domestic battery and resisting law enforcement and took him to the Allen County jail. At the jail, Nail took a breathalyzer test, which registered a blood alcohol level of 0.12. Three days later, Nail pleaded guilty to both pending charges and was sentenced to a suspended term of one year in jail and one year of unsupervised probation. Nail then filed this action, claiming that Gutierrez and Cutler violated his Fourth Amendment rights by entering his property without a warrant, physically restraining him, and using excessive force during the arrest. Nail also named the chief of police, Rusty York, as a defendant, claiming that York was liable for failing to train the officers and failing to institute proper departmental procedures for responding to 911 hang-up calls, handling domestic disturbances, and using force. The district court granted summary judgment to the defendants, reasoning that the officers had probable cause to enter Nail's back yard and home based on the 911 call; that Gutierrez's physical seizure of Nail was supported by reasonable suspicion; that the officers' use of force was reasonable under the circumstances; and that, without an underlying constitutional violation, Nail could not prevail on his claim for failure to train.

On appeal Nail challenges the grant of summary judgment for the defendants, a decision that we evaluate de novo viewing the evidence in the light most favorable to Nail. *See Golden Years Homestead, Inc. v. Buckland*, 557 F.3d 457, 461 (7th Cir. 2009). Nail first argues that once he offered a reasonable explanation for the 911 call—that Olmstead was trying to dial information and made a mistake—the officers lacked the exigent circumstances they needed to enter his "curtilage" without a warrant. *See United States v. French*, 291 F.3d 945, 951-52 (7th Cir. 2002). To begin with, we are not convinced that the officers ever entered Nail's curtilage: police officers are generally permitted to approach the back door of a residence in an attempt to interview someone if the front door proves fruitless. *See United States v. James*, 40 F.3d 850, 861-62 (7th Cir. 1994) (*rev'd in part on an unrelated ground,* 516 U.S. 1022 (1995)); *United States v. Daoust,* 916 F.3d 757, 758 (1st Cir. 1990) (collecting cases). And although it was Nail's burden to prove that the encounter took place on his curtilage, the record is missing several crucial pieces of information we would need to resolve the question: how large the yard was, how Nail typically used the yard, whether the fence completely enclosed the yard and back porch, whether the yard or porch were visible to the public, and whether Nail had taken any other measures to protect the yard and porch from observation. *See United States v. Dunn*, 480 U.S. 294, 301 (1987); *French,* 291 F.3d at 951-52. But the defendants have probably waived the argument, since they have not contested Nail's characterization of the yard and porch as curtilage.

In any event, the question of "curtilage" is really beside the point because the 911 call gave the officers all the exigent circumstances they needed. Nail's "reasonable explanation," which he has admitted was a lie, was not the end of the encounter. Olmstead

then failed to appear at the door as requested, Nail disappeared, and the officers heard the back door slam. These events made it reasonable for the officers to believe that Nail was fleeing or Olmstead was potentially in danger. *See, e.g., United States v. Elder,* 466 F.3d 1090, 1091 (7th Cir. 2006) (holding that officers' warrantless entry was justified to assure safety of person who called 911); *United States v. Najar,* 451 F.3d 710, 719-20 (10th Cir. 2006) (ruling that exigent circumstances justified warrantless entry where 911 caller hung up and when defendant answered door he acted suspiciously).

Nail also argues that the district court erred in rejecting his claim of excessive force, on the theory that no force was appropriate because the officers were "trespassers" whom he had a right to throw off his property without answering their questions. But even if Nail didn't have to respond to Gutierrez's questioning, that does not mean that the officers were required to ignore his evasive behavior. *See, e.g., Cady v. Sheahan,* 467 F.3d 1057, 1061-62 (7th Cir. 2006) (noting that evasive responses to police questions can help support reasonable suspicion). And Nail's argument that he was entitled to defend himself against the officers' "trespass" is absurd. They were not trespassing, and even if they had been, Indiana permits self-defense during an arrest only to avoid great bodily harm or death. *See Wilson v. State,* 842 N.E.2d 443, 447-48 (Ind. Ct. App. 2006). Nail was at risk of neither. The district court did not err in granting summary judgment for the officers on Nail's claim of excessive force.

Finally, Nail contends that he should have prevailed on his claim for failure to train because the officers admitted in interrogatories that they had not been instructed on how to respond to 911 hang-ups. But the point is irrelevant: as the district court correctly concluded, in the absence of a Fourth Amendment violation, Nail's claim about the police department's training program necessarily fails. *See Jenkins v. Bartlett,* 487 F.3d 482, 492 (7th Cir. 2007); *Alexander v. City of South Bend,* 433 F.3d 550, 557 (7th Cir. 2006).

**AFFIRMED**.