In the

# United States Court of Appeals

### For the Seventh Circuit

No. 07-4045

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

VIRGIL SMITH,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Indiana, Fort Wayne Division.
No. 06 CR 53—**William C. Lee**, *Judge.*

ARGUED FEBRUARY 9, 2009—DECIDED AUGUST 11, 2009

Before POSNER and SYKES, *Circuit Judges*, and DOW, *District Judge.**

DOW, *District Judge.* On December 9, 2002, Virgil Smith and four other individuals took part in a bank robbery in Fort Wayne, Indiana. Smith ultimately was convicted

---

* The Honorable Robert M. Dow, Jr., of the United States District Court for the Northern District of Illinois, sitting by designation.

on two counts: (i) armed bank robbery in violation of 18 U.S.C. §§ 2113(a), (d), and aiding and abetting that same bank robbery in violation of 18 U.S.C. § 2; and (ii) using a firearm during and in relation to a crime of violence in violation of 18 U.S.C. § 924(c), and aiding and abetting the use of a firearm during and in relation to a crime of violence in violation of 18 U.S.C. § 2. Smith received a sentence of 100 months' imprisonment on the first count and seven years on the second, to be served consecutively for a total of 184 months' imprisonment. Smith raises two arguments on appeal. First, he contends that there was insufficient evidence to support a conviction on the second count of the indictment. Second, he asserts that the district court should have dismissed his original indictment with prejudice under the Speedy Trial Act. Because we are not convinced by either argument, we affirm.

## I. Background

Virgil Smith, Melvin Woods, Jernard Freeman, DeMarcus White, and Rasheen Childs were involved in the robbery of a Bank One branch in Fort Wayne, Indiana. Smith admitted that he aided in the robbery, thus conceding guilt on Count One of the indictment. The factual matters at issue in this appeal concern the predicate for the finding of guilt on Count Two. In particular, we must focus on the testimony regarding the role that Smith played in the pre-crime preparations and whether he provided the weapon that ultimately was carried into the bank during the robbery.

The testimony against Smith provided by the other participants in the robbery was not entirely consistent

in several respects. In regard to the origin of the plan, Woods testified that Smith came to him with the idea of robbing a bank two months before the robbery actually took place; Freeman testified that he and Smith had their first conversation regarding the robbery a couple of weeks before it took place; White testified that he was not brought into the plan until early December 2002. For his part, Smith testified that he was in Los Angeles County Jail until November 4 or 5, 2002 and did not arrive in Fort Wayne until shortly before Thanksgiving. Smith further testified that Freeman and White approached him on November 30 or December 1, 2002 about robbing a bank and they asked him for a gun.

A critical area of testimony concerned the origin of the .45 caliber weapon that was used during the robbery. According to all three government witnesses, not only was it Smith's idea to use a gun during the robbery, but he volunteered to provide one. In fact, all three testified that, prior to the robbery, they saw Smith with the .45 pistol that Childs carried into the bank during the robbery. Freeman also testified that he saw Smith with a second gun, a .44 caliber Desert Eagle that remained in the trunk of one of the getaway cars during the robbery. Smith testified that he provided only the Desert Eagle and that he knew that it did not work. One of the defense witnesses, Ravonda Weatherspoon, testified that Freeman took a .45 from the house at which she was staying in March or April of 2002, although she did not know the make or model. Another defense witness, Donya Brown, testified that the night before the robbery she kicked Freeman out of her house where the five robbers

were meeting because he had a .45 and she had a "no guns in the house" rule.

Another testimonial matter of significance was the location of the .45 on the day of the robbery. Woods testified that Smith and Freeman picked him up in Freeman's car (the "dark Cutlass"), at which point Woods claims he was informed that the guns were in the trunk. Freeman, however, testified that he picked up Woods before picking up Smith. Freeman also testified that Smith put both the .45 and Desert Eagle in the trunk of Freeman's car.[1] Woods stated that they proceeded to White's apartment, at which time Smith and Freeman left in the dark Cutlass. Freeman recalled that Smith left by himself and returned with his girlfriend's car (the "white Sunfire") and Childs.[2] According to Woods, when Smith and Freeman returned, Childs was present and each of the three men was driving a car: Freeman, the dark Cutlass; Smith, the white Sunfire; and Childs, a stolen blue car. White testified that the four men gathered at his apartment, but Childs and Smith then left in the white Sunfire and returned with the stolen blue car. At that point, White said that he saw Smith with a .45 with

---

[1] According to Freeman's testimony at Smith's first trial, Smith told Freeman to put the guns in the trunk of Freeman's car.

[2] Freeman's testimony is unique in regard to the acquisition of the stolen blue car. Unlike the other witnesses, Freeman testified they did not pick that car up until after the failed attempt to rob a bank on the south side of town.

an extended magazine. Smith likewise testified that the men met at White's apartment the morning of the robbery. He also recalled going to White's apartment with Childs, but in separate cars—Childs in the stolen blue car and Smith in the white Sunfire. A defense witness, Devon Hood, stated that Woods and Freeman picked him up that morning and they smoked marijuana in Freeman's car where he observed a black pistol.

The group left White's apartment with the intention of robbing a bank on the south side of Ft. Wayne, but abandoned that plan when they observed that a police car was present. Woods and White testified that they then proceeded to the north side of the city where they met up in a ball field near the bank.[3] The testimony differs as to who was present in which car while they looked for a bank to rob. Yet, all of the witnesses agreed that before they proceeded to the bank, they last stopped at the ball field to finalize their plans. Woods stated that, once they had gathered at the ball field, Smith informed the others that he would wait outside the bank and watch for police and told Childs to get the .45 from the trunk of the dark Cutlass.[4] White testified that Smith handed the .45 to Childs in the Sunfire. Freeman testified that before they entered the bank, Childs opened the trunk of the dark

---

[3] In the first trial, Woods mentioned a second bank that the group almost robbed prior to the eventual robbery of the Bank One branch on the north side of Ft. Wayne.

[4] At the first trial, Woods said that Smith handed the gun to Childs.

Cutlass and procured the .45 handgun. Smith testified that although he gave Freeman the Desert Eagle on the morning of the robbery, he never put the Desert Eagle in the trunk of the Cutlass and he never gave Freeman the .45. According to Smith, Childs retrieved the .45 from the Cutlass, and Smith did not know that Childs had used a gun until after the robbery.

While the robbery took place, Freeman was in the Cutlass and Smith was in the Sunfire, both outside of the bank. Childs, White and Woods entered the bank. While Childs stood by the door and brandished the .45 pistol, White and Woods jumped over the counter and seized the money. The three then left the scene in the stolen car. The five individuals, in the three cars, proceeded back to the ball fields where they had met up before the robbery and ditched the stolen car. At that point, Childs and Smith were in the car with the money and the .45 used in the robbery. Woods, White and Freeman were in the dark Cutlass. As the two cars were exiting the area, a police officer pulled Freeman's car over and all three were arrested. Smith and Childs were able to leave the scene. Although Smith later was arrested, Childs was never apprehended and neither the .45 nor the money ever was recovered. Woods, Freeman, and White pleaded guilty and agreed to testify at Smith's trial.

## II.  Procedural History

Smith was charged in 2003 for his role in the robbery. In the original action, case number 03-CR-6, Smith filed a motion seeking to plead guilty on July 22, 2003, which

was denied on November 17, 2003. He then filed a motion to dismiss all charges against him, arguing that his right to a speedy trial had been violated. The court denied that motion on December 10, 2003, on the ground that Smith had suffered no prejudice by the delay. The matter proceeded to trial on December 17, 2003. Woods, Freeman, White, Ravonda Weatherspoon, and Donya Brown testified. Smith was convicted on the same two counts that form the basis of the present appeal and sentenced to a term of imprisonment of 221 months.

Smith filed his notice of appeal on March 24, 2004, arguing that his rights under the Speedy Trial Act ("the Act") had been violated. This Court held that any violation of the Act was harmless. See *United States v. Smith*, 415 F.3d 682, 686 (7th Cir. 2005). A limited remand to the district court followed, but this Court ultimately affirmed Smith's conviction. See *United States v. Smith*, 182 Fed. Appx. 586 (7th Cir. 2006). Smith then filed a petition for writ of certiorari. The Supreme Court granted Smith's petition, vacated this Court's judgment, and remanded the matter for proceedings in light of *Zedner v. United States*, 547 U.S. 489, 508-509 (2006), in which the Court held that harmless error is not an appropriate standard of review in the Speedy Trial Act context. This Court then reversed Smith's conviction, vacated his sentence, and remanded the case to the district court with instructions to determine whether the indictment should be dismissed with or without prejudice pursuant to 18 U.S.C. § 3162(a)(2).

On remand, after reviewing the parties' written submissions, the district court issued a five-page order dis-

missing the indictment *without* prejudice on October 3, 2006. The government filed a new criminal complaint against Smith on the same day. He was indicted on October 25, 2006, and proceeded to a bench trial that commenced on September 27, 2007.

On October 3, 2007, the district court issued an oral ruling. As the court noted, Smith conceded his guilt on Count One. As to Count Two, the court noted two viable theories of the case, each relating to one of the guns at issue in the case. The court found Smith not guilty under the "Desert Eagle" theory, essentially finding that because the evidence showed that the "Desert Eagle" gun was kept in the trunk of the car during the robbery, it was not used in the offense and could not support a conviction on Count Two. However, the court concluded that the "other gun theory"—referring to the .45 that was carried into the bank—did support a guilty determination on Count Two. The court acknowledged various conflicts in the testimony and remarked that its decision rested on a "credibility determination." The court found the three co-defendants' testimony to be credible and Smith's testimony "not credible." The court further found beyond a reasonable doubt that Smith was a leader and organizer and an aider and abettor as to the crime of using the .45 caliber gun during the robbery. And on the basis of the testimony and the court's findings, the court entered a finding of guilty on Count Two.

### III. Analysis

Smith presents two arguments on appeal: (i) there was insufficient credible evidence to support a guilty verdict

on Count Two and (ii) the district court should have dismissed the original indictment with prejudice under the Speedy Trial Act. We address each in turn.

### A. Sufficiency of the Evidence

Smith first challenges the sufficiency of the evidence adduced at trial in support of the trial court's decision to convict him on Count Two. According to Smith, the prosecution witnesses lacked credibility and the district court improperly rejected testimony that supported an alternative source of the gun that was used in the robbery.

As an initial matter, we note that Smith faces a steep uphill climb with a sufficiency of the evidence argument on appeal. See, *e.g.*, *United States v. Hicks*, 368 F.3d 801, 804 (7th Cir. 2004) (describing the standard of review facing the defendants on sufficiency of the evidence argument as "a daunting one"); *United States v. Gardner*, 238 F.3d 878, 879 (7th Cir. 2001) ("In attacking the sufficiency of the evidence, a defendant bears a heavy burden"). That heavy burden reflects the deference given to the trier of fact: to obtain a reversal, the defendant must convince the reviewing court that "after viewing the evidence in the light most favorable to the prosecution, [no] rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Curtis*, 324 F.3d 501, 505 (7th Cir. 2003) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). This Court's task therefore is not to "weigh the evidence" or to "second-guess" the trier of fact. *Gardner*, 238 F.3d at 879. And we will overturn a conviction based on insufficient

evidence only if the record is "devoid of evidence" from which the trier of fact—here, the trial judge—could have found guilt beyond a reasonable doubt. *Curtis*, 324 F.3d at 505 (citing *United States v. Menting*, 166 F.3d 923, 928 (7th Cir. 1999)).

Smith admits that he participated in the robbery and that he provided the Desert Eagle gun that was left in the trunk of the Cutlass during the robbery. The question is whether there was sufficient evidence that Smith aided and abetted the use of the .45 that was brought into the bank. As we previously have explained,

> A defendant may be liable for aiding and abetting the use of a firearm in violation of § 924(c) if the government proves that the defendant knowingly and intentionally assisted the principal's use or possession of a firearm during the violent felony or drug trafficking offense. The defendant must know, either before or during the crime, that the principal will possess or use a firearm, and then after acquiring knowledge intentionally facilitate the weapon's possession or use. Merely aiding the underlying crime and knowing that a gun would be used or carried cannot support a conviction under 18 U.S.C. § 924(c), because the defendant must aid and abet the possession, or carrying, or use of the weapon.

*United States v. Daniels*, 370 F.3d 689, 691 (7th Cir. 2004) (citations and quotations omitted). In finding Smith guilty of aiding and abetting, the district court stated that its disposition boiled down to credibility determinations. As the district court saw it, Smith's case turned on

whether to believe Smith or the three witnesses for the prosecution who testified that it was Smith's idea to use the gun and that he procured it. And the court sided with the prosecution witnesses, as was its prerogative after hearing the testimony and observing the witnesses.

Smith recognizes that the heavy burden that attends a sufficiency of the evidence challenge is compounded when such a challenge rests in large measure on taking issue with the trier of fact's credibility determinations. As this Court has explained, we do not "second-guess the trial judge's credibility determinations." *United States v. French*, 291 F.3d 945, 951 (7th Cir. 2002). The reasons for this deference are many: the trial judge "has had the best opportunity to observe the verbal and nonverbal behavior of the witnesses focusing on the subject's reactions and responses to the interrogatories, their facial expressions, attitudes, tone of voice, eye contact, posture and body movements, as well as confused or nervous speech patterns in contrast with merely looking at the cold pages of an appellate record." *Id*. In short, a reviewing court will set aside credibility determinations only if they are clearly erroneous, which occurs "only if the district court has 'chosen to credit exceedingly improbable testimony.'" *United States v. Robinson*, 314 F.3d 905, 907 (7th Cir. 2003); see also *United States v. Briggs*, 273 F.3d 737, 740 (7th Cir. 2001) (explaining that a district court's decision to credit one witness over another "can almost never be clear error"). And testimony will be found exceedingly improbable only if it is "internally inconsistent" or "implausible on its face." See *United States v. Cardona-Rivera*, 904 F.2d 1149, 1152 (7th Cir. 1990).

Smith submits that the district court overlooked numerous inconsistencies in the testimony of the prosecution witnesses and improperly discounted Smith's credibility on irrelevant factors. We recognize, as did the district court, that the testimony of the participants in the robbery was not consistent in every respect. Smith focuses on inconsistencies in the testimony concerning the events that took place at the ball field before the group proceeded to the bank—and, in particular, how the gun got into Childs' hands. Woods stated at the second trial that Smith told Childs to get the .45 out of the trunk of Freeman's car, which he did. That testimony is fairly consistent with Freeman's testimony that Childs got the gun from Freeman's trunk. However, Woods was impeached with his testimony from the first trial, during which he stated that Smith handed the gun to Childs. In addition, White testified that Smith handed the gun to Childs while Smith was sitting in the Sunfire.

While that testimony does present some factual discrepancies, it is neither internally inconsistent nor implausible. See *United States v. Woods*, 148 F.3d 843, 847 (7th Cir. 1998) (noting that eighteen months had passed since the robbery and that it was to be expected that witnesses would have slightly different recollections of events as they unfolded). In addition, and more important, the testimony on which Smith focuses does not go to the critical issue of who provided the gun or the idea to use the gun. It was the prosecution's contention—which the trial court accepted—that Smith provided the .45. It does not matter whether, as the final preparations for the robbery unfolded, Childs was handed

the gun or retrieved it from the trunk. As the trial court saw the events, without Smith, the .45 would not have been at the ball field at all, because all three prosecution witnesses testified that they saw Smith with the .45 prior to the robbery, Freeman testified that Smith in fact put the .45 in the trunk of the Cutlass on the day of the robbery, and Woods testified that Smith instructed Childs to retrieve the .45 from Freeman's trunk.[5] All of that testimony, which the trial judge was free to credit, amply supports the judge's decision.

We also cannot find fault with the district court's finding that Smith lacked credibility. In reaching that conclusion, the court noted (i) Smith's demeanor in his videotaped interrogation, (ii) his suggestion that the group proceed to the Bank One after encountering a police presence at another bank, and (iii) the fact that Smith ended up with the money despite his efforts to convince the court that he was a minor participant. We respectfully disagree with Smith's contention that the latter two factors have no plausible connection to a proper credibility determination. It appears from the record that the district judge felt that that those factors reflected poorly on Smith's credibility because they made less believable his explanation that although he was in fact involved in the robbery, he was a minor player, merely along for the ride.

---

[5] Defense counsel's impeachment of Freeman merely indicates that Smith *instructed* Freeman to put the guns in the trunk—testimony that also would support a guilty verdict for aiding and abetting.

Likewise, we see no error in the district court's decision not to credit Smith's argument concerning an "alternate source" of the .45. Weaving together the testimony of the defense witnesses, Smith contends that there was evidence that Freeman took the .45 from Weatherspoon's house and had it in his possession the night before the robbery and again the morning of the robbery. The district court commented on that evidence and noted that the testimony did not "really go[ ] to the heart of the—co-defendant's testimony." According to Smith, that was not a rational basis for discounting the allegedly exculpatory evidence. We disagree. There was no testimony as to the make or model of the .45 that Freeman allegedly took eight months before the robbery, and therefore there is no support for the position that the .45 that was in Freeman's possession months earlier must have been the same .45 that was taken into the bank. In addition, Freeman denied that he ever stole the .45, which the trial court could have accepted. In any event, even assuming that the testimony to which Smith points pertained to the same gun, it merely shows that someone other than Smith was holding it the day before and the morning of the robbery. The trial court thus was correct in observing that Smith's alternative source theory does not "go to the heart" of the case against Smith— namely, the co-defendants' testimony that it was Smith's idea to use the .45 and that he procured it for the robbery.

In sum, three witnesses identified Smith as the individual who presented the idea to use the gun and then provided the .45 that was used in the robbery. Smith's counsel cross-examined the witnesses and pointed out some discrepancies in their testimony, though none was

fatal, either individually or collectively. The district court also heard from and observed Smith. At the end of the case, the court chose to credit the testimony of Woods, Freeman, and White over the testimony of Smith, which was the court's prerogative. The decision to credit the plausible testimony of one witness over the plausible testimony of another "can almost never be clear error." *United States v. Briggs*, 273 F.3d 737, 740 (7th Cir. 2001). And the facts of this case do not present one of the rare instances of clear error, for there was nothing "exceedingly improbable" about the testimony of the prosecution witnesses.

### B. Speedy Trial Act

Smith also challenges the district court's decision to dismiss the first indictment *without* prejudice, instead of *with* prejudice. As noted above, that issue came before the district court after the Supreme Court vacated this Court's judgment on Smith's original conviction. We then vacated his sentence and remanded the case to the district court. On remand, the district court took briefing from the parties and issued a five-page written order in which it concluded that the indictment should be dismissed without prejudice pursuant to 18 U.S.C. § 3162(a)(2). We review that decision for abuse of discretion. See *United States v. Taylor*, 487 U.S. 326, 335 (1988); *United States v. Killingsworth*, 507 F.3d 1087, 1090 (7th Cir. 2007).

Under the pertinent statutory and decisional law, the district court was required to consider the following

factors in making its determination: (i) the seriousness of the offense; (ii) the facts and circumstances which led to the dismissal; and (iii) the impact of reprosecution on the administration of the Speedy Trial Act and on the administration of justice. See 18 U.S.C. § 3162(a)(2); *Taylor*, 487 U.S. at 333. "[A] district court must carefully consider those factors as applied to the particular case and, whatever its decision, clearly articulate their effect in order to permit meaningful appellate review." *Id*. at 336. Because the district court's task involves applying law to facts, this Court must "undertake more substantive scrutiny to ensure that the judgment is supported in terms of the factors identified in the statute." *Id*. at 337. "Nevertheless, when the statutory factors are properly considered, and supporting factual findings are not clearly in error, the district court's judgment of how opposing considerations balance should not be lightly disturbed." *Id*.

Smith does not contend, nor could he in good faith, that the district court failed to properly consider and articulate its findings on the first two factors. Smith concedes, as he did at the district court level, that armed bank robbery is a serious offense. The district court concurred, noting that the seriousness of the crime was "self-evident." The district court also agreed with Smith on the second factor, finding that the violation of the Act was not the result of bad faith on the part of the government. The time allotted under the Act simply "ran out inadvertently." The court noted that the defendant's silence underscored the unwitting nature of the delay and subsequent violation. For those reasons, the district court

concluded that "dismissal with prejudice would not serve any purpose of encouraging the government to avoid neglect or bad faith in the prosecution of its cases."

Smith's argument for reversal thus necessarily focuses on the third factor. He maintains that the district court failed to consider the impact of reprosecution on the administration of the Speedy Trial Act and on the administration of justice. Smith's argument is predicated on a fairly novel theory—that when a Speedy Trial Act violation is resolved in a defendant's favor after a lengthy appeals process, the district court's analysis of the third factor should encompass the time spent on appeal, not just the length of the period triggering the underlying violation.

In fact, the district court did consider both periods, but it accorded less weight to the appellate delay than to the initial delay in the trial court. It determined that although the four year duration of the appeals process affected the administration of justice—and thus could not be discounted altogether—that period was less significant in the calculus (and thus entitled to less weight) than the excessive delay that led to the Speedy Trial Act violation in the first place. That bifurcated approach was premised on the court's belief that Section 3162(a)(2) is concerned primarily with the seventy day period set forth in the statutory text. We conclude that the district court's relative weighting was reasonable and do not detect in the statute or case law any mandate to give equal or more weight to appellate delays as compared to trial delays. Indeed, although the Supreme Court did not

explicitly address the issue, the district court was on solid ground in reading *Taylor* as at least implicitly supporting the view that the Section 3162(a)(2) analysis should focus more on the delay giving rise to the violation in the trial court than on the length of time spent in the appellate process. See *Taylor*, 487 U.S. at 336.

Using the framework described above, the district court concluded that the impact of the Speedy Trial Act violation of between six and thirty days was minimal and that Smith had failed to establish that he had been prejudiced by that delay. Smith does not contest that finding. The court then turned to the period of time spent in appeals. Smith's contention that the district court undervalued the impact of this delay—and in fact should have found it to be presumptively prejudicial—relies principally on *Doggett v. United States,* 505 U.S. 647 (1992). That case involved an eight and a half year delay between indictment and arrest, which led to concerns about the fairness of adjudication, including diminished memories and loss of potentially exculpatory evidence. *Id.* at 654. But Smith's reliance on *Doggett* is misplaced for several reasons.

Most importantly, there had been no trial in *Doggett* to memorialize testimony. By contrast, Smith had such a trial. As a result, the district court observed that

> [t]he evidence and the witnesses' testimony has been preserved by virtue of the earlier trial, so that there is no reason to believe that a new trial would be compromised. In any event, it is the government that has the most to lose by the delay: "prosecutor bears a heavy burden of persuasion, and the degradation

of evidence generally cuts against the party with the burden."

The concern expressed in *Doggett* that "excessive delay presumptively compromises the reliability of a trial in ways that neither party can prove, or for that matter, identify" (*id*. at 655) thus applies with far less force when a defendant has a previous trial record with which to work.

Smith nevertheless maintains that the impact of the appellate delay was not slight and that it was used as an excuse to present inconsistent evidence. That argument fails to persuade because, as the district court noted, any prior inconsistent testimony could be used for impeachment purposes in the second trial. That is precisely what occurred. Defense counsel impeached the prosecution witnesses whenever they strayed from their original testimony.

*Doggett* also is factually distinguishable because the delay in that case was nearly twice as long as the four years that Smith's case was on appeal. We accept Smith's point that a delay of four and a half years may be prejudicial in certain situations. Under *Taylor*, these matters can be considered only on a case-by-case basis. But we are not persuaded that this case presents one of those situations. Acknowledging that his delay was half that endured by the defendant in *Doggett*, Smith cites a case in which the court found that a ten month delay in ruling on a motion to suppress constituted delay. See *United States v. Moss*, 217 F.3d 426 (6th Cir. 2000). Notably, and fatally to Plaintiff's argument, *Moss* focused on the

effect of the delay triggering the underlying Speedy Trial Act violation. The better comparison here is the time period of between six and thirty days that gave rise to the Speedy Trial Act violation, not the four years that it took for the appellate process to run its course.

We have stated before that an "open-ended list" of the sort drawn up by Congress in Section 3162 "imbues a court with great discretion." *United States v. Fountain*, 840 F.2d 509, 512 (7th Cir. 1988). In exercising that discretion, the district court did not "ignore[ ] or slight[ ] a factor that Congress has deemed pertinent." *Taylor*, 487 U.S. at 337. To the contrary, the court carefully considered each factor in light of the arguments of the parties and explained the rationale for its determination that the factors weighed strongly in favor of dismissing the indictment without prejudice. Seeing no clearly erroneous factual findings and no abuse of discretion in the court's final decision, we will affirm.

## IV. Conclusion

Because we are not persuaded that the evidence presented at trial was insufficient to sustain Smith's conviction on Count II or that the district court abused its discretion in dismissing the original indictment of Smith without prejudice, the judgment of the district court is

AFFIRMED.