**In re John T. CONNORS and Mary L. Connors, Debtors.**

**Union Planters Bank, N.A., Plaintiff,**

v.

**John T. Connors and Mary L. Connors, a/k/a Lynn Connors, Defendants.**

Bankruptcy No. 99–32167.
Adversary No. 00–3027.

United States Bankruptcy Court,
S.D. Illinois.

Oct. 5, 2000.

**232**

Myron A. Hanna, Belleville, IL, for plaintiff.

Donald M. Samson, Belleville, IL, for debtors/defendants.

### OPINION

GERALD D. FINES, Bankruptcy Judge.

This matter having come before the Court for trial on September 25, 2000, on a Complaint Objecting to Discharge of Debtors filed by Plaintiff, Union Planters Bank, N.A., on January 31, 2000; the Court, having heard sworn testimony and argu-ments of counsel and being otherwise fully advised in the premises, makes the following findings of fact and conclusions of law pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure.

On July 30, 1999, Debtors/Defendants filed for relief under Chapter 7 of the Bankruptcy Code. Among the many creditors scheduled in the Debtors' bankruptcy proceeding was Creditor, Union Planters Bank, N.A. The uncontroverted facts adduced at trial indicate that, from November 1994 through December 1995, Plaintiff, Union Planters Bank, N.A., loaned the Debtors the aggregate sum of approximately $28,239,000. The instant adversary proceeding was filed by the Plaintiff objecting to the discharge of the Debtors herein under 11 U.S.C. § 727(a)(3). The Complaint alleges that the Debtors/Defendants have concealed, destroyed, mutilated, and/or failed to keep or preserve recorded information, including books, documents, records and papers from which their financial condition or business transactions might be ascertained.

On January 20, 2000, pursuant to an Order of this Court granting Plaintiff's request for a Rule 2004 examination of the Debtors, Debtors appeared and were deposed by the Plaintiff concerning their financial transactions prior to the filing of the instant bankruptcy proceeding. Even though the Debtors had been directed to produce documentation concerning their business transactions and their financial affairs, Debtors appeared at their Rule 2004 examination on January 20, 2000, with virtually no records of their financial transactions. When questioned about his record-keeping practices, John T. Connors testified that he did not keep paperwork, and that anyone that he dealt with kept his paperwork for him. He stated that: "I really don't keep paperwork, then I don't lose it." Mary L. Connors testified at her Rule 2004 examination on January 20, 2000, that certain records had been thrown out in the trash when the parties moved

from their former residence in October 1999. Having virtually no recorded information on which to determine Debtors' financial condition and their business transactions prior to their filing for relief under Chapter 7 of the Bankruptcy Code, Plaintiff filed the instant adversary proceeding seeking a denial of the Debtors' discharge under 11 U.S.C. § 727(a)(3), based upon the Debtors' failure to keep financial records and their admission that some financial records had been disposed of shortly after their filing for bankruptcy relief.

The relationship between the Debtors and the Plaintiff, Union Planters Bank, N.A., began in approximately November 1994. John T. Connors was one of the original owners and founders of the Alton Belle Casino in Alton, Illinois, which was the first riverboat casino in the area. As a result of his ownership interest, John T. Connors owned 2.5 million shares of the stock of Argosy Gaming Company, which was the corporation which owned the Alton Belle. His stock was worth approximately $36.75 per share in November 1994.

In late 1994, John T. Connors embarked on four major ventures which would require substantial capital investments on his part. Prior to this time, John T. Connors had done most of his banking at West Pointe Bank & Trust Company, in Belleville, Illinois. However, that bank was unable to provide the amount of capital which was needed, so he then approached Magna Bank, now known as Union Planters Bank, N.A., to borrow the funds he would need. As collateral for the borrowing with the Plaintiff Bank, John T. Connors pledged his shares in Argosy Gaming Company to the Plaintiff Bank to secure a line of credit. At the time John T. Connors opened a line of credit with the Plaintiff Bank, the price of the Argosy Gaming stock was more than sufficient to fully secure his line of credit.

The ventures begun by Debtors, in late 1994 and 1995, included the building of a home in Belleville, Illinois, at the cost of approximately $4,000,000; the development of Kings Pointe Racquet & Fitness Club, a state-of-the-art tennis facility located in Belleville, Illinois, at a cost in excess of $10,000,000; the purchase of a casino on the outskirts of Las Vegas, Nevada, known as the Alystra; and the purchase of a casino in Colorado, known as Crapper Jacks. The evidence is clear that, not only did each of the four ventures which the Debtors pursued throughout 1995 require considerable initial capital investment, they also turned out to be considerable cash drains. As a result, the Debtors were forced to borrow substantial sums of money from the Plaintiff Bank. They were also forced to borrow money from other financial institutions and from private parties. All of the monies borrowed from these various entities were run through the Debtors' personal checking accounts at the Plaintiff Bank and at West Pointe Bank in Belleville, Illinois. The evidence indicates that neither John T. Connors nor Mary L. Connors paid much attention to the balances in their checking accounts during the periods in question. In fact, the testimony clearly indicates that the Debtors didn't even attempt to balance their checking accounts, but would rather rely on the banks to notify them when there was a need to place more money in the accounts to cover their expenses.

None of the four major ventures in which the Debtors embarked upon, beginning in late 1994, turned out as they had planned. The house which they built in Belleville, Illinois, took approximately 14 months to build at a cost of approximately $4,000,000. The evidence indicates that not only was the home costly to build, but, given its size and location, it was extremely costly to maintain. Construction of the Kings Pointe Racquet & Fitness Club resulted in a cost in excess of $10,000,000, and the evidence indicates that the racquet club struggled from the very beginning and that the Debtors were constantly required to infuse more cash into the club just to keep the doors open. The evidence

further indicates that the Debtors' gaming ventures, the purchase of the Alystra Casino and Crapper Jacks, fared no better than the racquet club. John T. Connors testified that he purchased both the Alystra and Crapper Jacks for what he believed to be very reasonable prices with the idea that he could turn a tremendous profit on both properties within a short period of time. The Alystra had an unlimited gaming license which John T. Connors believed would attract additional investors, resulting in the building of a hotel complex that would eventually draw many visitors. Unfortunately, the Alystra was located some distance from the main gambling area in Las Vegas, and, during the period of time which John T. Connors owned the Alystra, he was unable to attract the additional investment that he had hoped for. As a result, rather than being a tremendous financial investment, the Alystra became nothing more than a tremendous cash drain. Like the Alystra, Crapper Jacks was also purchased for what John T. Connors believed to be a very reasonable sum, with the hope that the State of Colorado would lift its $5 gaming limit, thus making the license at Crapper Jacks much more valuable than it was at the time of the original purchase. Unfortunately for the Debtor, John T. Connors, during the period of time which he owned the casino Crapper Jacks, the State of Colorado did not lift the $5 gaming limit. Because of the remote location of the casino in the mountains of Colorado, it was only able to be open 7 or 8 months out of the year, and it too became a tremendous cash drain.

Between 1995 and 1997, given the enormous needs for cash, the Debtors engaged in continual borrowing, not only from the Plaintiff Bank, but from other financial institutions and from private parties. Literally millions of dollars were poured into the Debtors' financial ventures during this period of time. The evidence adduced at trial indicates that money was shifted back and forth between the various entities owned by the Debtors in an attempt to keep them going. The evidence also indicates that, at various periods of time, the Debtors were repaid sums of money which had been put into each of the business ventures which they were involved in; however, there are no records to indicate how much money was repaid and what was done with the repayments.

By early 1997, it was clear that the Debtors' financial picture was deteriorating, and the value of the Argosy Gaming Company stock had fallen drastically. As a result, the Plaintiff Bank sought and was granted lien rights in nearly all of the property owned by the Debtors, both real and personal. The financial situation of the Debtors did not improve, and, as a result, in April 1997, the Bank made a demand upon the Debtors for repayment of all outstanding loans, which, of course, the Debtors were unable to meet. In May 1997, Plaintiff Bank sold the Argosy Gaming Company stock. Foreclosure proceedings were commenced against the Debtors' residence in June 1997, and upon the Kings Pointe Racquet & Fitness Club facility in October 1997.

As noted above, throughout the period of November 1994 up until their filing for relief under Chapter 7 of the Bankruptcy Code in July 1999, Debtors apparently accomplished all their financial transactions through checking accounts at the Plaintiff Bank and at West Pointe Bank & Trust Company in Belleville, Illinois. The evidence indicates that, in the four years preceding the bankruptcy, there was in excess of $13,000,000 in checks and other debit activity through the checking accounts at the Plaintiff Bank. However, in the 12 months preceding the bankruptcy filing, the amount of the activity in the account in the Plaintiff Bank was in the sum only slightly in excess of $1,500. The evidence further indicates that, in the Debtors' accounts at West Pointe Bank & Trust Company, in the four years preceding the bankruptcy filing, there was in excess of $2,800,000 in checks and other debit activity; however, in the 12 months

preceding the filing of the bankruptcy, the amount of the activity was only slightly in excess of $3,400. At the time of filing for relief under Chapter 7 in July 1999, Debtors maintained that they had virtually no assets nor income. However, their Schedule of Expenses indicated that they had annual expenses of nearly $80,000 per year; yet they showed no income to pay these expenses. Debtors testified that they were able to maintain their expenses by eating their meals at the Kings Point Racquet & Fitness Club facility and from donations from friends and family. However, they have produced no recorded information to substantiate such support.

Pursuant to 11 U.S.C. § 727(a)(3):

(a) The court shall grant the debtor a discharge, unless—...

(3) the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case;

■■■ Consistent with the "fresh start" policy underlying the Bankruptcy Code, exception to discharge, under § 727(a)(3), should be construed strictly against the creditor and liberally in favor of the debtor. *See: In re Pimpinella*, 133 B.R. 694 (Bankr.E.D.N.Y.1991). In applying the objection to discharge under § 727(a)(3), it is important to recognize that a discharge in bankruptcy is a privilege, not a right, and should only inure to the benefit of the honest debtor. *In re Pimpinella, supra*, at 697; *In re Frommann*, 153 B.R. 113, at 116 (Bankr.E.D.N.Y.1993). Section 727(a)(3) requires, as a precondition to discharge, that debtors produce records which provide creditors "with enough information to ascertain the debtor's financial condition and track his financial dealings with substantial completeness and accuracy for a reasonable

period past to present." *In re Martin*, 141 B.R. 986, 995 (Bankr.N.D.Ill.1992). This provision of the Bankruptcy Code insures that trustees and creditors will receive sufficient information to enable them to "trace the debtor's financial history; to ascertain the debtor's financial condition; and to reconstruct the debtor's financial transactions." *In re Martin, supra*, at 995. *See also: In re Shapiro*, 59 B.R. 844, 848 (Bankr.E.D.N.Y.1986); *In re Pimpinella, supra*, at 697; and *In re Frommann, supra*, at 116. Courts and creditors should not be required to speculate as to the financial history or condition of the debtor, nor should they be compelled to reconstruct the debtor's affairs. *In re Frommann, supra*, at 117; *In re Pimpinella, supra*, at 698; and *In re Shapiro, supra*, at 848. The burden of proof rests upon the plaintiff to prove the elements of 11 U.S.C. § 727(a)(3) by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991).

■■■ The United States Court of Appeals for the Seventh Circuit has clearly set forth the standards and the applicable law under 11 U.S.C. § 727(a)(3). The Seventh Circuit has made it clear that, where a debtor is involved in business transactions, the debtor is held to a higher standard of record keeping and that a debtor has a duty to supply complete financial documentation for a reasonable period prior to filing for relief under the Bankruptcy Code. *See: In re Juzwiak*, 89 F.3d 424 (7th Cir.1996); and *In re Scott*, 172 F.3d 959 (7th Cir.1999). In these cases, it is clear that creditors are not required to sift through documents and attempt to reconstruct the flow of a debtor's assets. The burden is upon the debtor and not the creditor to organize and to reconstruct the debtor's business affairs. Creditors should not be forced to undertake an independent investigation of a debtor's affairs; rather they have a right to be supplied with dependable information on which they can rely in tracing a debtor's financial

**236**

history. Section 727 makes complete financial disclosure a condition precedent to the privilege of discharge. *See: United States v. Ellis,* 50 F.3d 419, at 425 (7th Cir.1995), *cert. denied* at 516 U.S. 849, 116 S.Ct. 143, 133 L.Ed.2d 89 (1995). It is also equally clear that creditors do not need to prove that a debtor intended to defraud them in order to demonstrate that a discharge should be denied pursuant to 11 U.S.C. § 727(a)(3). *See: Juzwiak, supra,* at 430.

 The facts in the instant case are substantially similar to those facts in both the *Juzwiak* and *Scott* decisions noted above. As in both *Juzwiak* and *Scott,* the Debtors herein were involved in complex financial business dealings, and yet they have failed to produce adequate records to explain the disposition of millions of dollars. In fact, the uncontroverted testimony of both the Debtors indicates that they were not good at keeping records, and, in fact, it is clear that some financial records which they did keep were disposed of when they moved from their former residence in October 1999, several months after they filed for relief under Chapter 7 of the Bankruptcy Code. The testimony of the Debtors attempting to explain much of their financial activity between 1994 and the filing of their bankruptcy was simply not credible. The law is clear that "the trustee and creditors are not required to take the debtor's word as to his financial situation." *See: Juzwiak, supra, citing In re Kearns,* 149 B.R. 189 (Bankr.D.Kan. 1992). Additionally, the Court finds that the Debtors' testimony that the Plaintiff has sufficient records to determine the financial condition of the Debtors is unpersuasive. "Creditors are not required to sift through documents in an attempt to reconstruct the flow of debtor's assets." *Frommann, supra,* at 118. It is the debtor's obligation to supply the financial information from which financial condition can be ascertained. Furthermore, the Court finds that the records which were available to the Plaintiff Bank in this instance were not sufficient to explain nearly all of the financial transactions that occurred in the Debtors' businesses over the period of time in question. The Debtors' main defense seems to be that they have turned over all records which they could obtain, including records that were discovered in July 2000, located in a storage facility in Lebanon, Illinois, relating to the business activities of the Kings Pointe Racquet & Fitness Club. While it is true that the Debtors have produced boxes full of certain financial records and have made available access to filing cabinets full of financial records of the Kings Pointe Racquet & Fitness Club, the Court concludes that the Debtors have utterly failed to furnish a satisfactory written record and accounting for their current financial condition and for the nature of their business transactions for a reasonable period in the past, as is clearly required under § 727(a)(3). As the Court stated in the case of *In re Frommann, supra,* at 118: "A debtor cannot simply place sacks of records before the bankruptcy judge or trustee and request the judge or trustee to sift through the documents and attempt to reconstruct the flow of the debtor's assets." Finally, it is apparent from the clear evidence that, even if the Creditor, the Court, and the Trustee were to sift through the documentation which the Debtors have provided, said documentation would not completely account for the financial transactions of the Debtors prior to their bankruptcy filing. There is evidence that the Debtors borrowed significant sums of money from private individuals, and there are no records to account for these monies. For example, the Debtors borrowed $250,000 from John T. Connors' brother, and, not only are there no written records of the disposition of this money, but John T. Connors couldn't accurately testify as to what was done with the money. The Debtors also borrowed substantial sums of money from banking institutions other than the Plaintiff Bank that have not been accounted for.

Pursuant to the clear mandate of 11 U.S.C. § 727(a)(3) and the case law interpreting that section, the Court must conclude that, under the facts of the present case, the Debtors must be denied their discharge in bankruptcy. While the Debtors have provided certain financial records and documentation, the Court finds that those records are wholly inadequate to allow the Debtors' creditors to ascertain Debtors' financial condition and to satisfactorily explain their financial transactions dating back to a reasonable period in the past.