FOR PUBLICATION

# UNITED STATES BANKRUPTCY APPELLATE PANEL
## FOR THE FIRST CIRCUIT

**BAP NO. MS 21-019**

**Bankruptcy Case No. 17-31052-EDK**
**Adversary Proceeding No. 18-03009-EDK**

**RICHARD M. SHOVE,**
**f/d/b/a Ricks Complete Lawn Care, and**
**KATHLEEN E. SHOVE,**
**Debtors.**

**JOSE R. HERNANDEZ,**
**Plaintiff-Appellee,**

**v.**

**RICHARD M. SHOVE and KATHLEEN E. SHOVE,**
**Defendants-Appellants.**

**Appeal from the United States Bankruptcy Court**
**for the District of Massachusetts**
**(Hon. Elizabeth D. Katz, U.S. Bankruptcy Judge)**

**Before**
**Godoy, Lamoutte, and Harwood,**
**United States Bankruptcy Appellate Panel Judges.**

**James Ehrhard, Esq., and Carrie Naatz, Esq., on brief for Defendants-Appellants.**
**Cynthia A. Spinola, Esq., on brief for Plaintiff-Appellee.**

**April 29, 2022**

**Harwood, U.S. Bankruptcy Appellate Panel Judge.**

Richard M. Shove ("Shove") and Kathleen E. Shove ("Kathleen" and, collectively with Shove, "the Debtors") appeal from the bankruptcy court's judgment denying Shove's discharge pursuant to §§ 727(a)(3) and 727(a)(4)(A).[1] For the reasons discussed below, we **DISMISS** Kathleen's appeal for lack of standing. As for Shove's appeal, we conclude the bankruptcy court did not clearly err when it found that Shove failed to maintain adequate records and that his failure was unjustified. Accordingly, we **AFFIRM** the bankruptcy court's denial of Shove's discharge under § 727(a)(3).[2]

## BACKGROUND

### I. Pre-Bankruptcy Events

The Debtors are married and reside in Massachusetts. Shove operated a landscape company known as Rick's Complete Lawn Care Service for about 25 years and also owned 90 rental units. In 2013, however, Shove was injured in a fall and, after the 2014-2015 landscaping season, he closed his landscaping business. Thereafter, Shove worked for his son, who owned a landscaping company. On December 28, 2015, a house fire damaged the Debtors' house, forcing them to vacate their home for approximately a year.

Earlier that year, on February 11, 2015, Jose R. Hernandez ("Hernandez"), then Shove's employee, sustained a serious injury of his own in a fall from a snow-covered roof during the course of his employment. At the time of Hernandez's injury, Shove did not have a

---

[1] References to "Bankruptcy Code" or to specific statutory sections are to 11 U.S.C. §§ 101-1532, unless otherwise noted. References to "Bankruptcy Rule" are to the Federal Rules of Bankruptcy Procedure and references to "Rule" are to the Federal Rules of Civil Procedure.

[2] As discussed, infra, we need not reach the § 727(a)(4)(A) issue.

workers' compensation policy in effect. Hernandez sued him in state court to recover damages for his injuries. In September 2017, Hernandez obtained a judgment in the amount of $965,201.53, which is secured by a lien on various properties owned by Shove.

## II. The Bankruptcy Proceedings

### A. The Bankruptcy Filing

A few months later, on December 15, 2017, the Debtors filed a joint chapter 7 bankruptcy case. Thereafter, Jack E. Houghton was appointed chapter 7 trustee (the "Trustee"). On Schedule A/B, the Debtors disclosed that they jointly owned their primary residence in Lenox, Massachusetts, five multi-unit properties in Lenox, and a single-family home in Lee, Massachusetts, and that Shove solely owned two multi-unit properties in Pittsfield, Massachusetts. Schedule D reflected that the secured claims against the Debtors' properties exceeded $1.8 million, while Schedule E/F indicated that approximately $540,000 of their unsecured debt was "mortgage" or "mortgage deficiency debt."

### B. The Commencement of the Adversary Proceeding

In August 2018, Hernandez filed a five-count amended complaint against the Debtors (the "First Amended Complaint"). Only Counts III and IV are involved in this appeal. In Count III of the First Amended Complaint—after incorporating the background facts and allegations of the prior counts—Hernandez sought the denial of Shove's discharge under § 727(a)(3), on the grounds that Shove, in the operation of his property rental and landscaping businesses, "concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which [his] financial condition or business transactions might be ascertained." In Count IV, Hernandez again incorporated the facts and allegations of the prior counts by reference, and requested a judgment

3

denying Shove's discharge under § 727(a)(4)(A), on the grounds that Shove "made a false oath or account" at the § 341 meeting of creditors and in his schedules.

### C.     The Motion to Dismiss

On August 24, 2018, the Debtors filed a motion to dismiss the First Amended Complaint (the "Motion to Dismiss"). They argued that Count III (the § 727(a)(3) count) should be dismissed for failure to state a claim under Rule 12(b)(6) and Bankruptcy Rule 7012, because it "merely parrot[ed]" the statute, made "vague," "unsupported assertions," and "combined facts" from previous counts. Moreover, the Debtors asserted that Hernandez "failed to do the minimum" to state a cause of action under § 727(a)(3) by "fail[ing] to plead what records [we]re necessary, why they [we]re necessary, or that they [we]re unavailable elsewhere." Highlighting that Count IV (the § 727(a)(4)(A) count) sounded in fraud, the Debtors asserted that Hernandez failed to "allege with particularity the who, what, when, where, and how of the fraud" as required by Rule 9(b). Accordingly, the Debtors asked the court to dismiss Count IV pursuant to Rule 12(b)(6), Rule 9(b), and Bankruptcy Rule 7012.

Hernandez opposed the Motion to Dismiss as to Shove, but not as to Kathleen. He argued that the allegations in Count III were more than sufficient to withstand dismissal and disputed the charge that the factual allegations set forth in Count IV were "mere conclusory statements."

After a hearing on January 17, 2019, the bankruptcy court entered the following order (the "Order Partially Denying Motion to Dismiss"), without any explication:

> Granted in part and denied in part. The Motion is Granted as to all counts against Kathleen Shove and as to Count V against Richard Shove. The Motion is denied as to Counts I through IV against Richard Shove.

4

The parties did not include a transcript of that hearing in the appellate record. We discuss the import of that omission below.

## III.    The Trial

The court conducted a five-day trial in February and March 2020 and heard closing arguments in April 2020. In total, seven witnesses testified, and their testimony covered a broad range of topics. However, we summarize only the testimony that is essential to the denial of Shove's discharge under § 727(a)(3).

### A.    Shove's Testimony

Shove testified that, before the house fire, he kept business records in boxes stored in his basement, where he managed both his landscaping and property rental businesses. Shove testified, however, that he did not have any records for the post-fire period. For this reason, at his attorney's request, in March 2018, Shove prepared documents entitled "Rents Received" (the "Rent Rolls"), which identified several multi-unit properties and the corresponding rents charged for each month from January 2017 through March 2018. The Rent Rolls were based on Shove's memory and only reflected amounts he hoped to collect, not rents he had actually collected. To compile the necessary information, Shove explained, he "went to each tenant" and "asked . . . what they paid for the year." Notably, each Rent Roll included the following caveat at the bottom, signed by both Debtors: "[T]his is best recollection, as we no longer keep records. Many tenants do not pay regularly, or partial-pay their rent. . . . The money received from the paying tenants goes to maintenance, upkeep, and utility bills for all properties." Shove testified that he received some rent payments in cash but did not keep a receipt of those payments for his own personal records.

5

Through July 2017, Shove deposited some rent checks in an account he referred to as the "Mission Management" account. Thereafter, Shove used a different account, ending in number 6134 (the "6134 account"), for the deposit of some rents. When questioned regarding certain bank statements,[3] however, Shove had difficulty identifying any deposits that correlated with the amounts listed on the Rent Rolls. For example, although he identified a single deposit of rent in the amount of $372.77 on his Mission Management bank statement for January 2017, he could not identify any tenant who was charged that amount of rent. Similarly, he could not identify any deposits into the 6134 account representing rents received for the months of October 2017 and November 2017.

Shove stated that "Kathleen used to cash [rent] checks" and they kept the "cash on hand to pay bills." Occasionally, Kathleen would use the cash to purchase money orders to pay utility bills. The Debtors paid bills in this manner to avoid overdraft fees, according to Shove's testimony. Generally, bank deposits consisted of rent payments with "something else . . . mixed in," such as Kathleen's wages or Airbnb income derived from renting their residence. Yet, Shove was unable to point to a line item on the Rent Rolls for the Airbnb income. When asked whether he had "any records of any kind made contemporaneously . . . that corroborate[d] his statement about what rents [he had] received," Shove answered: "Not currently, no."

When asked if there was "any way . . . that anyone looking closely at [his] business affairs or . . . records[ ] could determine how much cash he had on hand at various times," Shove answered:

> Yes, because I've disclosed it on my taxes. I've disclosed on my Schedule I, that
> we take in . . . $4,800 a month, and I disclosed exactly what we tried to take in,

---

[3] While produced in response to a first request for production of documents, these bank statements were neither maintained nor provided by Shove. Instead, Hernandez's attorney paid the bank(s) a $700 fee for copies of Shove's relevant account statements.

and I actually erred on caution and went higher to make sure that I had all my income, even if I was below.

After Shove testified that he and Kathleen "had a lot of cash on hand," Hernandez's counsel asked Shove if he had any record that would reflect the amount of cash he had in December 2017 (the month he filed his bankruptcy case). Shove responded:

> You're asking about a specific month, how much cash we would have. We . . . wouldn't know that. It depends on who paid . . . maybe a tenant paid that month, maybe they didn't. I . . . wouldn't know how much cash was on hand at that time.

As for the absence of records relating to the period pre-dating the house fire, Shove explained that certain contents of his home were lost in the fire. Regarding the missing documents, he added:

> We had just lost our house. We were out in the street, looking for a place to live. I had tenants not paying rent, living in a home of my own that I couldn't even go to. We had no place to go. So . . . was I thinking about these documents at this time? I'm sorry, I was not.

Shove never explained the absence of records for the period post-dating the fire, or why he never resumed any practice or method of recordkeeping for that period. One thing is clear from his testimony, however: contemporaneous records for this period do not exist.

On cross-examination, Shove's attorney asked him to identify a photograph of two binders' worth of documents he produced in response to Hernandez's request for production of documents, apparently to demonstrate the volume of his response. Shove reiterated on cross-examination that, while he sometimes gave rent receipts to tenants, he did not maintain any for his own personal records. Further questioning on this topic proceeded as follows:

> Q. [D]id [the Trustee] ask for rent receipts?
>
> A. He asked but we couldn't find any. We explained to him . . . we don't keep them anymore.

7

Q. So if this entire case hinged on you getting me rent receipts, could you get me any?

A. No, I could not.

Q. And why is that?

A. Because I don't have any.

## B.     The Trustee's Testimony

When questioned about financial records he received from Shove, the Trustee stated he received some bank statements, "a rudimentary income statement or a balance sheet that . . . was utilized in preparation of [the Debtors'] taxes" and "prepared by someone else," and "certain receipts . . . indicating that they had made some real estate tax payments to the [T]own of Lenox." The Trustee also testified that he received from the Debtors a "P&L statement" and, upon request, copies of their tax returns.

The Trustee testified that he extensively explored the reasons why the Debtors conducted their financial affairs mainly in cash:

> [O]ne of the reasons given to me was that they had been depositing in the past their rental receipts into a local bank. However, the bank had begun some sort of collection activity against them that resulted in the bank acquiring funds from their account, so that after that point they testified . . . to basically dealing in cash, both in their receipts as well as paying their bills. And they testified to not depositing some or most of their cash receipts and rather [than] doing that they would pay bills directly either by acquiring money orders and then paying the bills or the like.
>
> . . . [T]here was quite a discourse . . . about that with my asking various questions about why they dealt with cash, what the purpose of that was. And so that resulted in, for example, my requesting the rent-rolls, because otherwise they had said that there [weren't] any. And my asking for bank statements and what financial documents they did [have], in order for me and my staff to attempt to ascertain their income, their expenses, their assets, and their liabilities.
>     . . . .

Q. Did you ever satisfy yourself that you had a complete handle on the status of their financial affairs from the records that they gave you?

A. No, I didn't.

On cross-examination, the Trustee testified that "the main problem[,] but not the only problem, . . . was the [Debtors'] use of cash[,]" adding that "it was very difficult . . . to be forensic about it . . . and to try to reconstruct their income both before and even after . . . the bankruptcy filing." He elaborated: "[W]hen I asked about [the Debtors' use of cash] . . . it didn't seem to me that there was any rhyme or reason to it, and it was very difficult for me to follow and to understand their logic for why they were doing it that way." For instance, the receipts for payment of real estate tax bills indicated that part of the payment had been made in cash and part by check.

### C. Kathleen Shove's Testimony

Kathleen confirmed that she was "the primary person responsible for managing the rents and expenses on the properties[.]" Kathleen also testified that she collected some rents in the form of cash, which she then stored in various places, including the glove box of her car, a kitchen drawer, and the living room hutch.

### D. Closing Arguments and Post-Trial Briefs

With respect to the § 727(a)(3) claim, in his closing argument, counsel for Shove argued that the volume of documents Shove produced "provided insight into everything you could possibly want." He highlighted that Shove even took the Trustee on a tour of his properties. He contended that the only documents allegedly missing were rental receipts, and that this omission was immaterial because Shove "provided reams of bank records, reams, every tax return you could want." In his post-trial brief, Shove said relatively little about Hernandez's § 727(a)(3) claim. He asserted: "[I]f the argument . . . was that . . . failing to provide records destroyed [in a

9

fire] two years prior to his bankruptcy filing [w]as a violation of § 727(a)(3)," the argument must fail because there was no evidence to establish "that the fire was anything other than an accident." Shove's counsel added that any argument that Shove failed to provide copies of rental receipts must also fail, as he and his wife "both testified that they did not regularly give out rental receipts." Then, in a striking mischaracterization of the Trustee's testimony, he asserted the Trustee "testified that he felt that he had received the documentation he needed . . . ."

Counsel for Hernandez countered in her closing argument: "The fact is [Shove] never produced one business record." In support of the § 727(a)(3) claim, in his post-trial brief, Hernandez likened this case to Patriot Group, LLC v. Fustolo (In re Fustolo), 597 B.R. 1 (Bankr. D. Mass. 2019), aff'd, No. 19-10343-TSH, 2020 WL 636449 (D. Mass. Feb. 11, 2020), where the court denied the debtor a discharge on the grounds that he had failed to keep or maintain any books or records enabling the court to ascertain his financial condition.

## IV. Memorandum of Decision

Ultimately, it was the failure to keep records after the house fire—especially records relating to the rental properties—that proved fatal to Shove's discharge. With respect to the § 727(a)(3) count, the court concluded: "Although the lack of records for the period preceding December 2015 has been adequately explained, Shove has not justified the wholesale failure to keep records regarding his financial affairs for the post-Fire period." Hernandez v. Shove (In re Shove), 629 B.R. 96, 113 (Bankr. D. Mass. 2021). The court elaborated:

> Shove owned and managed a total of approximately 90 rental properties since 1996 and operated Rick's Complete for at least 25 years. In contrast to their pre-Fire practice, the Shoves failed to retain rental income receipts or document rental income and expenses after the Fire. Particularly in light of Shove's lengthy history as a business and rental property owner, the Shoves' change in practice regarding rental income and expense records after the Fire (and while Hernandez's Superior Court case was pending), the ease by which Shove could have recorded rental receipts and expenses, and Shove's demeanor as a witness,

10

the Court finds that Shove's post-Fire failure to keep accurate records of rental income and expenses was unreasonable and not justified under all of the circumstances of the case. Consequently, the Court rules that Shove's discharge should be denied pursuant to § 727(a)(3) . . . .

Id. at 115-16.

In support of the foregoing conclusion, the court found the following facts:

The Shoves did not keep records of rental payments following the Fire. Most of the rental income received, whether in cash or by check, was not deposited into a bank account, but was collected and kept in the glove box of Kathleen's vehicle, a drawer in the Shoves' kitchen, or a hutch in the Shoves' living room. Shove acknowledged that as of the petition date, Shove had neither any record of nor ability to discern the amount of cash on hand[.] And, with regard to the rental income received, both Shove and Kathleen testified that, in contrast to their pre-Fire practice, they did not maintain any contemporaneous rental income receipts or records. Nor are the other documents or records provided to either the Trustee or Hernandez sufficient to ascertain Shove's financial condition or business transactions in the post-Fire, pre-filing period.

After being informed that the Shoves dealt primarily in cash in the prepetition period and did not keep contemporaneous records, the Trustee requested the Shoves' 2017 income tax return (which was not yet prepared) and rent rolls for all rental properties, so that the Trustee could ascertain the Shoves' income, expenses, assets, and liabilities. However, the rent rolls prepared for the Trustee did not reflect the amount of rental income actually received within any given month; instead, they indicated the amount of rent that was *supposed* to be received. Furthermore, each rent roll includes a statement that the information provided "is a best recollection, as we no longer keep records" and that "[m]any tenants do not pay regularly or partial pay their rent." Pl. Ex. 45. The Court concludes that the rent rolls do not constitute "records" containing sufficient information to ascertain Shove's financial condition or business transactions. The information contained in the 2017 tax return is similarly unreliable. Although the return was prepared by a third person, the information included in the 2017 tax return was based on financial worksheets filled out by Shove and was not completed with the aid of actual financial records. Pl. Ex. 44.

Shove testified that some post-Fire rental income was deposited into two bank accounts—the 6134 account and a Berkshire Bank account ending in 713, which the Shoves refer to as the "Mission Management" account. Shove testified that the 6134 account contained automatic deposits from Airbnb and Kathleen's employer, and "no other money that would come in except for tenants." Trial Tr. 206:2-207:12, Feb. 26, 2020 ("Feb. 26 Tr."). But at trial, Shove was unable to verify which deposits into the 6134 account reflected rental income. For example, when asked to confirm that a March 10, 2017 deposit in the amount of $459.51

11

with no identified source or payor was rental income, Shove could only verify that the deposit could be a rent payment "with something mixed in." Feb. 25 Tr. 58:7. Shove testified that, for rental income that was deposited, the Shoves more often used the Mission Management account.

However, taken together, the 6134 account and the Mission Management account statements are not consistent with the rent rolls and of course fail to verify the undeposited cash rent receipts. For example, the June 2017 Mission Management statement, Pl. Ex. 3, 271, shows total deposits of $3,300, and the June 2017 6134 account statement shows no deposits other than from identifiable non-tenant sources, Pl. Ex. 3, 529-536. But the June 2017 rent roll lists total rental income of $4,525. Pl. Ex. 45. The August through November 2017 Mission Management account statements show no activity, Pl. Ex. 3, 273-276, and the 6134 account statements from October through November 2017 show a sole deposit, in the amount of $1,250, not from identifiable non-tenant sources, Pl. Ex. 3, 557-572. But the rent rolls list rental income of $3,075 for October 2017 and $4,075 for November 2017. Pl. Ex. 45. It is clear that Shove's bank account statements do not corroborate the rent rolls, do not provide an accurate record of Shove's actual rental income, and do not trace the flow of rental income.

Regarding rental expenses, Shove testified that the Shoves retained and stored hard copies of bills from 2016 forward, such as utility bills, in boxes. The Trustee recalled receiving copies of some receipts for real estate tax payments made to the [T]own of Lenox but the copies of bills and expense information Shove provided, when compared with the Shoves' bank account statements, do not sufficiently explain the use and disposition of Shove's rental income. Furthermore, because Kathleen often paid expenses in cash or by money order from cash on hand, Shove's bank account statements do not provide an accurate record of Shove's actual rental expenses either.

While the Trustee acknowledged that the Shoves were for the most part responsive to his concerns and information requests, this Court may find that a denial of discharge is warranted under § 727(a)(3) even if the debtor did not conceal or fail to keep records with ill intent. See State Bank of India v. Sethi (In re Sethi), 250 B.R. 831, 837 (Bankr. E.D.N.Y. 2000). Here, the Court concludes that Shove failed to keep accurate and adequate records of his post-Fire rental income and expenses from which Shove's total net rental income, rental accounts receivable, rental expenses, and cash on hand could be ascertained.

Id. at 113-15 (footnote omitted).

The court also entered a Judgment the same day, denying Shove a discharge pursuant to §§ 727(a)(3) and 727(a)(4). This appeal followed.

12

## I.        Shove

Shove begins by arguing that the bankruptcy court erred in denying his Motion to Dismiss the First Amended Complaint in its entirety, as it was a "typical 'shotgun pleading'" within the meaning of Weiland v. Palm Beach County Sheriff's Office, 792 F.3d 1313, 1321, 1323 (11th Cir. 2015) (identifying "a complaint containing multiple counts where each count adopts the allegations of all preceding counts" as a "shotgun pleading").  While Shove acknowledges the First Circuit's admonition in Estate of Cunningham v. Millennium Laboratories of California, Inc., 713 F.3d 662, 664 n.2 (1st Cir. 2013), that the "shotgun" nature of a pleading "cannot serve as a basis for granting a motion to dismiss," he relies on the Eleventh Circuit's guidance in Estate of Bass v. Regions Bank, Inc., 947 F.3d 1352, 1358 (11th Cir. 2020), that it is not the proper function of courts to "parse out . . . incomprehensible allegations . . . ."  Shove further claims that Count III, in particular, should have been dismissed because it "merely parrots the elements [of § 727(a)(3)] or makes vague unsupported assertions."

Turning to the merits of the § 727(a)(3) ruling, Shove asserts that, in denying his discharge under that section, the bankruptcy court "penaliz[ed]" him "for using a cash system" and overlooked that he "produced all the records that were available."  In his appellate brief and at oral argument, Shove insists that the only documents missing were rental receipts.  Shove argues that here, as in da Silva v. Jackson (In re Jackson), 576 B.R. 282, 287 (Bankr. D. Mass. 2017), it was "unremarkable not to retain the receipts."  In his appellate brief, Shove attempts to distinguish this case from Harrington v. Simmons (In re Simmons), 810 F.3d 852, 858 (1st Cir. 2016), where the debtor's failure to keep any records in connection with his 27 income-producing properties precluded his discharge under § 727(a)(3).  And, at oral argument, to

distinguish this case still further from Simmons, Shove noted that the debtor in Simmons "had millions of dollars of secured debt."

Finally, Shove challenges the bankruptcy court's analysis of the justification for his failure to keep records, asserting that the court failed to "properly apply the Simmons factors," including the education, experience, and sophistication of the debtor; the volume of the debtor's business; the complexity of the debtor's business; and the amount of credit extended to the debtor or his business. In an effort to demonstrate that his *post*-fire recordkeeping omissions were indeed justified under the circumstances, Shove argues for the first time:

> [T]he year after the fire destroyed the [Debtors'] home the entire family was displaced and living in an apartment with what belongings . . . could be salvaged in a POD in their driveway.

> In addition to being displaced and trying to maintain normalcy for their children, the [Debtors] had the corresponding emotional and financial stresses of defending a lawsuit and paying for it, all while they were in financial distress and facing foreclosures on all homes including their personal residence and property being taken by receivership.

## II.     Hernandez

Hernandez insists that, in the First Amended Complaint, he "recited sufficient facts . . . to state a plausible claim for relief" in Count III, highlighting paragraphs 91 through 103 of that count. Citing Rule 8(a)(2), Hernandez argues that a complaint need only contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Relying on Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007), he adds that "'detailed factual allegations' are not required." With respect to the court's substantive ruling on the § 727(a)(3) count, Hernandez argues the record overwhelmingly supports the court's findings that Shove failed to keep post-fire financial records and that the failure was not justified under the circumstances.

14

## APPELLATE JURISDICTION

### I.     Finality

Before addressing the merits of an appeal, we must determine we have jurisdiction, even if the issue is not raised by the litigants. Boylan v. George E. Bumpus, Jr. Constr. Co. (In re George E. Bumpus, Jr. Constr. Co.), 226 B.R. 724, 725-26 (B.A.P. 1st Cir. 1998). We may hear appeals from final judgments of the bankruptcy court. 28 U.S.C. § 158(a)-(c). A bankruptcy court's judgment denying a debtor's discharge under § 727 is a final order. Gagne v. Fessenden (In re Gagne), 394 B.R. 219, 224 (B.A.P. 1st Cir. 2008); see also Cox v. Villani (In re Villani), 478 B.R. 51, 58 (B.A.P. 1st Cir. 2012). Accordingly, we have jurisdiction to consider Shove's appeal of the Judgment. Although the Order Partially Denying Motion to Dismiss was interlocutory when entered, Lopez Stubbe v. Banco Cent. Corp. (In re Empresas Noroeste, Inc.), 806 F.2d 315, 317 (1st Cir. 1986), it later merged into, and became reviewable upon entry of, the Judgment. Segarra Miranda v. Banco Popular de P.R. (In re Rivera Mercado), 599 B.R. 406, 416 (B.A.P. 1st Cir. 2019). We, therefore, also have jurisdiction over that order, at least in the context of Shove's appeal.

### II.     Standing

Shove, however, is not the only appellant named in this appeal. His wife, Kathleen, has joined in the appeal. Mindful that "finality is not the sole determinant" of our jurisdiction, Formatech, Inc. v. Sovereign Bank (In re Formatech, Inc.), 483 B.R. 363, 367 (B.A.P. 1st Cir. 2012), we must consider the impact of standing principles on this appeal. "Moreover, as with other jurisdictional factors, standing may be raised *sua sponte* at any time." Id. (citations omitted). Because Kathleen was not aggrieved by the Judgment or the evidentiary rulings, she lacks standing to appeal. See Spenlinhauer v. O'Donnell, 261 F.3d 113, 117 (1st Cir. 2001)

15

(stating "standing to appeal from a final bankruptcy court order is accorded only to a 'person aggrieved'") (citation omitted). This appeal is, therefore, dismissed as to Kathleen for lack of standing. See Bank of Bennington v. Thomas (In re Thomas), 431 B.R. 468, 473 (B.A.P. 8th Cir. 2010) (dismissing on standing grounds wife's appeal of judgment denying husband's discharge).

## STANDARDS OF REVIEW

"Although the ultimate decision about whether to grant or withhold a discharge is a mixed question of law and fact," Gannett v. Carp (In re Carp), 340 F.3d 15, 25 (1st Cir. 2003) (citations omitted), Shove essentially challenges two factual findings, namely that: (1) he failed to keep and preserve adequate financial records; and (2) his failure was not justified. "Accordingly, we 'review only for clear error, with due regard . . . to the opportunity of the bankruptcy court to judge the credibility of witnesses.'" Id. (citation and some internal quotation marks omitted); see also Fagnant v. Cohen Steel Supply, Inc. (In re Fagnant), BAP No. 05-024, 2006 WL 314353, at *1-2 (B.A.P. 1st Cir. Feb. 9, 2006) (reviewing decision denying discharge under § 727(a)(3) for clear error). Under the clear error standard, the bankruptcy court's "findings of fact and the conclusions drawn therefrom ought not to be set aside 'unless, on the whole of the record, we form a strong, unyielding belief that a mistake has been made.'" In re Carp, 340 F.3d at 22 (citation omitted). "[I]f the bankruptcy court's findings are supportable on any reasonable view of the record, we are bound to uphold them." Id. (citations omitted).

With respect to the Order Partially Denying Motion to Dismiss, however, we apply a de novo standard of review. See Penate v. Hanchett, 944 F.3d 358, 365 (1st Cir. 2019).

16

## DISCUSSION

### I.    The Order Partially Denying Motion to Dismiss

### A.    The Effect of the Missing Transcript on Our Analysis

We begin our analysis with Shove's challenge of the Order Partially Denying Motion to Dismiss. As noted above, in that order, the bankruptcy court declined—without explanation—to dismiss Counts I through IV against Shove. Whether and to what extent the court explained the reasons for its decision at the hearing on the motion remain uncertain, as a transcript of the hearing is not included in the record.

In failing to produce a transcript of the January 17, 2019 hearing on the Motion to Dismiss, Shove fell short of his obligations as an appellant. See Fed. R. Bankr. P. 8009(a)(4) (requiring appellants to designate as part of the record on appeal "any opinion, findings of fact, and conclusions of law relating to the issues on appeal, including transcripts of all oral rulings"). Although the First Circuit has warned repeatedly that it "will not review a claim of error if the appellant has failed to include a transcript of the pertinent proceedings in the record on appeal," it has occasionally considered an appellant's claim of error "to the extent possible from the record before" it, when confronted with a missing transcript. Valedon Martinez v. Hosp. Presbiteriano de la Comunidad, Inc., 806 F.2d 1128, 1135 (1st Cir. 1986) (citations omitted); see also Kyle v. Dye (In re Kyle), 317 B.R. 390, 393 (B.A.P. 9th Cir. 2004) (stating "the appellate court has discretion to disregard the [record] defect and decide the appeal on the merits") (citations omitted), aff'd, 170 F. App'x 457 (9th Cir. 2006). Accordingly, because the Motion to Dismiss—at least insofar as it pertains to Count III—involves a strictly legal rather than factual issue, we will exercise our discretion to consider the bankruptcy court's decision not to dismiss the § 727(a)(3) count, even in the absence of a transcript. Indeed, as demonstrated below, since

the application of Rule 12(b)(6) proceeds in mechanical fashion as to that count, our analysis, while not facilitated, is not wholly impeded by the incomplete record.

**B.      The Court Properly Declined to Dismiss Count III**

"To survive a motion to dismiss under Rule 12(b)(6) . . . , made applicable here by [Bankruptcy] Rule 7012 . . . , a complaint need only allege 'enough facts to state a claim for relief that is plausible on its face.'" Aspire Fed. Credit Union v. Robinson (In re Robinson), 595 B.R. 148, 154-55 (Bankr. S.D.N.Y. 2019) (considering a Rule 12(b)(6) motion to dismiss a complaint brought under various subsections of § 727(a)) (citation omitted). "The question in a Rule 12 motion to dismiss is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." Id. at 155 (citation and internal quotation marks omitted). "Courts use a two-pronged approach when considering a motion to dismiss." Id. (citations omitted). "First, the court must accept all factual allegations in the complaint as true, discounting legal conclusions clothed in factual garb." Id. (citations omitted). "Second, the court must determine if these well-pleaded factual allegations state a 'plausible claim for relief.'" Id. (quoting Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009)).

"A motion to dismiss a [§] 727(a)(3) claim is properly denied where the complaint specifically alleges that (a) the debtor failed to maintain any accounting or financial records and (b) that the failure made it impossible to determine the debtor's financial condition . . . ." Rasmussen v. LaMantia (In re LaMantia), Adv. Pro. No. 19-1002, 2019 WL 5388056, at *8 (Bankr. D. Me. Oct. 18, 2019) (citing In re Robinson, 595 B.R. at 158-59). Here, to state his claim for relief under § 727(a)(3), among other things, Hernandez alleged in Count III:

> The Debtors, Richard Shove and Kathleen Shove, in their operation and
> management of their various income[-]producing properties in Berkshire County
> have concealed, destroyed, mutilated, falsified, or failed to keep or preserve any

recorded information, including books, documents, records, and papers, from which [Shove's] financial condition or business transactions might be ascertained.

In this manner, Hernandez satisfied the standard articulated in LaMantia. While to some degree the quoted text does parrot the elements of the statute, it also does more: it identifies the type of financial information that is lacking. Thus, we conclude Count III states a plausible claim for failure to maintain financial records under § 727(a)(3) and the bankruptcy court, therefore, correctly declined to dismiss it.

Although Shove argues that the complaint should have been dismissed as a "shotgun pleading," he offers no persuasive reason to reject the First Circuit's instruction that the shotgun nature of a pleading—including the incorporation by reference of all previous allegations and counts—"cannot serve as a basis" for a motion to dismiss. Millennium Labs. of Cal., Inc., 713 F.3d at 664 n.2. (citations omitted). In addition, he fails to explain his own failure to heed the First Circuit's further admonition that such pleading deficiencies are better addressed in a motion for a more definite statement under Rule 12(e). See id. Thus, the "shotgun" argument for dismissal is easily dispatched.[4]

---

[4] Because this appeal is decided under § 727(a)(3), we do not reach whether the bankruptcy court properly denied the Motion to Dismiss as to Count IV, the § 727(a)(4)(A) count. Were we to embark upon such an analysis, however, it would likely yield a different result, dictated by those cases that have held that a § 727(a)(4)(A) claim "'must include more than just a bare allegation that a debtor failed to list something on his schedules.'" Smith v. Smith (In re Smith), 489 B.R. 875, 897 (Bankr. M.D. Ga. 2013) (citation omitted); see also Schindler v. Milliron (In re Milliron), 629 B.R. 893, 913 (Bankr. D. Alaska 2021) ("A plaintiff must . . . allege a 'particular false statement' to succeed on a cause of action under § 727(a)(4)(A).") (citation omitted); Crowder v. Wilbur (In re Wilbur), 574 B.R. 782, 797 (Bankr. N.D. Ga. 2017) ("To state a claim for objection to discharge under § 727(a)(4)(A), Plaintiffs must allege sufficient facts to show Defendant made a false oath in connection with the case that is fraudulent and material.") (citation omitted). Given our affirmance on § 727(a)(3) grounds, any error by the bankruptcy court in permitting the § 727(a)(4)(A) count to stand would have been harmless. See Harutyunyan v. Gonzales, 421 F.3d 64, 70 (1st Cir. 2005) (observing, in an immigration case, that a harmless error is one that "would [not] likely have made a dispositive difference in the outcome of the proceeding") (citations omitted).

Having concluded that the bankruptcy court correctly declined to dismiss Count III, our analysis advances to an examination of the merits of the court's ruling on that count.

## II. The Bankruptcy Court Did Not Err in Denying Shove's Discharge under § 727(a)(3)

### A. The § 727(a)(3) Standard

"In exchange for a fresh start, a debtor must paint a basic picture of his financial condition . . . ." In re Simmons, 810 F.3d at 855. "Every debtor has a duty to maintain books and records accurately memorializing his business affairs." Id. at 857 (citation omitted). "Section 727(a)(3) operates in furtherance of this duty: by virtue of the statute, a bankruptcy court may deny a discharge to a debtor who has failed to 'keep or preserve' adequate business records 'from which the debtor's financial condition or business transactions might be ascertained.'" Id. (quoting 11 U.S.C. § 727(a)(3)). "Congress's evident purpose in enacting [§] 727(a)(3) was to give interested parties and the court a reasonably complete picture of the debtor's financial condition during the period prior to bankruptcy." Id. (citation omitted). Thus, "[i]n order to obtain a discharge, a debtor must 'keep and preserve' records." Transworld, Inc. v. Volpe (In re Volpe), 317 B.R. 684, 690 (Bankr. D.S.C. 2003).

"To implement this record-keeping requirement, § 727(a)(3) provides a two-step approach." Hand Crafted Brands, LLC v. Hughes (In re Hughes), Adv. Pro. No. 21-03003 (AMN), 2022 WL 244646, at *7 (Bankr. D. Conn. Jan. 25, 2022). "First, the 'initial burden lies with the creditor to show that the debtor failed to keep and preserve any books or records from which the debtor's financial condition or business transactions might be ascertained.'" Id. (quoting D.A.N. Joint Venture v. Cacioli (In re Cacioli), 463 F.3d 229, 235 (2d Cir. 2006)). Second, "[i]f the creditor shows the absence of records [of the debtor], the burden falls upon the

20

bankrupt to satisfy the court that his failure to produce them was justified." Id. (citation and internal quotation marks omitted).

**B.      The § 727(a)(3) Standard Applied**

**1.      The Finding that Shove did not Keep and Preserve Adequate Records**

In explaining the meaning of the phrase "keep and preserve" as used in § 727(a)(3), one court emphasized that the terms are "not synonymous," stating:

> "'Keep' has the same meaning it would have in phrases such as 'to keep a diary' or to 'keep a record', that is, to maintain a record by entering it in a book. Otherwise the repetition of the word 'preserve' is superfluous, a disfavored result." [Peterson v. Scott (In re Scott)], 172 F.3d 959, 969 (7th Cir. 1999). Keep also means to maintain continuously and methodically. Lubman v. Hall (In re Hall), 174 B.R. 210, 214 (Bankr. E.D. Va. 1994).

In re Volpe, 317 B.R. at 690. "Record-keeping need not be precise to the point of pedantry: records can be adequate without being textbook models." In re Simmons, 810 F.3d at 857-58. "The operative standard is functional: a debtor's records must 'sufficiently identify the transactions [so] that intelligent inquiry can be made of them.'" Id. at 858 (quoting Razzaboni v. Schifano (In re Schifano), 378 F.3d 60, 69 (1st Cir. 2004)). "[T]he only requirement is . . . that the 'trail' of the debtor's assets must be discernable." In re Volpe, 317 B.R. at 690 (citation omitted). "The standard is an objective one. A debtor's records may be judged deficient under [§] 727(a)(3) even if the debtor did not intend to conceal financial information, or harbored an honest belief that he did not need to keep records[.]" In re Simmons, 810 F.3d at 858 (citations omitted). "Additionally, [the] debtor's records must be kept in a manner which is contemporaneous to the events as they unfold." In re Volpe, 317 B.R. at 690 (citing Turoczy Bonding Co. v. Strbac (In re Strbac), 235 B.R. 880, 885 (B.A.P. 6th Cir. 1999)).

Here, the record easily supports the bankruptcy court's finding that Shove failed to keep and preserve adequate records. Beyond Shove's own testimony that he did not keep

21

contemporaneous records, each of the Rent Rolls contained a note stating that the Debtors "no longer ke[pt]" financial records. The inadequacy of Shove's records is further established by the Trustee's testimony that he never had "a complete handle on the status of [the Debtors'] financial affairs" and that he was unable to "reconstruct" their financial transactions in a "forensic" manner.[5]

### 2. The Finding that the Failure was not Justified

The question becomes whether Shove's failure to keep and preserve records was justified under the circumstances. See id. at 693 ("Once it is determined that a debtor's records are inadequate, the burden shifts to the debtor to provide a justification."). The Code does not specify what constitutes justification. See Meridian Bank v. Alten, 958 F.2d 1226, 1233 n.6 (3d Cir. 1992). To determine whether the failure to keep or preserve records was justified, the First Circuit considers "the debtor's education, experience, and sophistication; the volume and complexity of the debtor's business; and whatever other circumstances are made relevant by the idiosyncrasies of the case." In re Simmons, 810 F.3d at 858 (citing Meridian Bank, 958 F.2d at 1231). The "ability to prevail on such a defense turns on whether [the] asserted justification is objectively reasonable[.]" Id. (citation omitted).

In this instance, the record supports the bankruptcy court's finding that, under the circumstances, Shove's failure to maintain records was not justified. First, the record establishes that Shove is a person with extensive business experience. He operated his landscaping business

---

[5] Indeed, in light of this testimony, we are deeply troubled by certain misrepresentations that Shove's counsel made at oral argument, namely, that the Trustee "never stated he was unable to discern the financial situation of the Debtor." As noted above, the record reflects that Shove's counsel made a similar misrepresentation in the post-trial brief he filed on Shove's behalf. The repetition of the mischaracterization of the Trustee's testimony in this manner suggests that it was not an inadvertent occurrence but, rather, a calculated choice or part of a litigation strategy. Should that be the case, it would go without saying that we do not countenance misrepresentations of the record or disregard for the truth.

for at least 25 years and owned many income-producing properties. A "reasonably prudent person" with the same level of experience and volume of business would have maintained records, including contemporaneous rent rolls. See id. (stating the "standard is that of a reasonably prudent person in the same or similar circumstances").

Shove's asserted justification for the failure to preserve records in the aftermath of the house fire was that he was preoccupied with his family's well-being. This argument is problematic for two reasons. First, it comes too late. In the proceedings below, Shove ignored his burden to establish justification. Both his closing argument and post-trial brief were silent on this element. Because this particular justification argument was first raised and developed in Shove's appellate briefing, it is waived. See E. Sav. Bank, FSB v. LaFata (In re LaFata), 483 F.3d 13, 22 (1st Cir. 2007) (observing arguments raised for the first time on appeal are deemed waived). Second, even if the justification argument were not waived but, rather, preserved by virtue of Shove's scant testimony on the topic, it would still be insufficient to relieve Shove of responsibility for completely abdicating his recordkeeping duties, especially well past the period during which he and his family were displaced from their home.

Moreover, despite his protestations to the contrary, Shove's recordkeeping failures are reminiscent of In re Simmons, where the First Circuit was confronted with a debtor who owned 27 income-producing properties and "a total absence of information regarding the amount of rent the debtor received each month; a dearth of bank statements tracing the flow of rent proceeds; and a general absence of documentation regarding income earned from or expenses paid in connection with any of the debtor's properties." 810 F.3d at 858. Viewing the gaps in documentation as "disturbing," especially in light of the debtor's experience and education, id., the Simmons court affirmed the denial of his discharge, reasoning:

23

> A debtor need not keep and preserve meticulously detailed records in order to secure a discharge in bankruptcy. Nor must a debtor provide an infinitely detailed explanation of where his money and property have gone. But the debtor must keep and preserve records containing enough information to paint a reasonably clear picture of his finances during the period leading up to the filing of his bankruptcy petition. He also must offer some satisfactory explanation for apparent losses and deficiencies. In this case, the debtor has not been able to cross this low threshold—and he has offered no legally objectively reasonable justification for his failure.

Id. at 860. While the record before us is silent as to Shove's level of education, the volume of his real estate investment activity is clear. Shove once owned as many as 90 rental units. In addition, Shove testified that he owned his landscaping business for at least 25 years. Therefore, it would be difficult to characterize him as unsophisticated or his business as small, such that the failure to keep and preserve records might be excused. Cf. Bartolotta v. Lutz, 485 F.2d 227, 229 (5th Cir. 1973) (holding debtor's Christmas tree business, conducted only one month out of the year, was not so complex as to require the keeping of books and records); Pilot Point Nat'l Bank v. Redfearn (In re Redfearn), 29 B.R. 739, 740-41 (E.D. Tex. 1983) (holding small farmer with limited education was not required to keep books). Moreover, from a review of the relevant case law, it appears that a debtor's responsibility for recordkeeping is not easily abdicated without consequence. Courts have rejected seemingly grave circumstances as justification for the failure to keep records. See, e.g., Fox v. Miller, 589 B.R. 659, 667 (C.D. Cal. 2018) (rejecting, in summary judgment context, debtor's asserted justification of advancing age and failing health in light of debtor's sophistication); In re Sethi, 250 B.R. at 842 (rejecting debtor's proffered justification of two angioplasties and open-heart surgery); Rissman v. Mann (In re Mann), 102 B.R. 873, 874 (Bankr. S.D. Fla. 1989) (finding the debtor's "operation for cancer," "mental collapse," and "drug dependency problem" did not excuse his failure to keep financial records in light of his sophistication and education).

24

Finally, the record of Shove's omissions should be considered together with his demeanor at trial and the bankruptcy court's resulting assessment of his credibility, to which great deference should be given:

> Both Shove and Kathleen at times appeared condescending and visibly frustrated by Hernandez's counsel. Their testimony was . . . credible in some respects, but often incomplete or evasive by way of opportunistic purported confusion.

In re Shove, 629 B.R. at 103-04; see also United States v. Smith, 576 F.3d 681, 687 (7th Cir. 2009) (explaining that trial court's credibility determinations are owed deference due to the opportunity of that court to "observe the verbal and nonverbal behavior of the witnesses"); Thiara v. Spycher Bros. (In re Thiara), 285 B.R. 420, 427 (B.A.P. 9th Cir. 2002) ("On appeal, the reviewing court shall give 'due regard . . . to the opportunity of the bankruptcy court to judge the credibility of the witnesses.'") (citation omitted). In light of the foregoing, the bankruptcy court did not commit clear error when it found that Shove did not offer a sufficient justification for the failure to keep and preserve adequate financial records. Accordingly, we affirm the bankruptcy court's Judgment denying Shove's discharge under § 727(a)(3).

Shove's various arguments do not impact our analysis. Shove seems to argue that the sheer volume of what he produced should be deemed an adequate substitute for contemporaneous financial records. However, his focus "on the quantity of the records that he produced misses the crucial point that the total absence of records" related to his income-producing properties makes it impossible for creditors to accurately determine his financial condition and business transactions. Caneva v. Sun Cmtys. Operating Ltd. P'ship (In re Caneva), 550 F.3d 755, 762 (9th Cir. 2008). "Mere *volume* of document production . . . does not necessarily satisfy the recorded information preservation requirements of § 727(a)(3)." Stanziale v. Boyajian (In re Boyajian), 486 B.R. 306, 325 (Bankr. D.N.J. 2013). Creditors, the court, and

the trustee are not required to "sift through the documents and attempt to reconstruct the flow of the debtor's assets." Krohn v. Frommann (In re Frommann), 153 B.R. 113, 118 (Bankr. E.D.N.Y. 1993) (citations omitted). Shove's effort, post-petition, to reconstruct rent rolls by knocking on the doors of his tenants is not an acceptable substitute for maintaining contemporaneous rent records. It does not cure either his pre-petition failure to do so or the inadequacy of his records as of the petition date.

Shove's argument that he produced tax returns is also unavailing. It is well established that "tax returns prepared by an accountant from whatever records the accountant can garner from the tax payer[ ] are not a significant indica[tor] of sufficient record keeping." Id. (citations and internal quotation marks omitted); see also Gupta v. Neupmann (In re Neupmann), Adv. Pro. No. 19-5022 (JAM), 2021 WL 5072010, at *6 (Bankr. D. Conn. Oct. 28, 2021) (requiring "tax returns *and their supporting documentation*" to ascertain a debtor's financial condition) (citation and internal quotation marks omitted); Agai v. Antoniou (In re Antoniou), 527 B.R. 72, 80 (Bankr. E.D.N.Y. 2015) (stating "tax returns alone 'are wholly insufficient for . . . a creditor to ascertain the debtor's financial condition'") (citation omitted); In re Boyajian, 486 B.R. at 325 (same); In re Volpe, 317 B.R. at 693 (same).

One of Shove's recurring arguments is that he turned over all records that he had relating to his rental properties. Several courts, however, have previously rejected similar arguments. See, e.g., In re Neupmann, 2021 WL 5072010, at *6 ("Even if the Defendant has turned over the documentation he has in his possession, this does not necessarily meet the requirements of a debtor in bankruptcy.") (citation omitted); Desiderio v. Devani (In re Devani), 556 B.R. 37, 43 (Bankr. E.D.N.Y. 2016) (finding that when the debtor "made no attempt to fulfill his disclosure obligations as a debtor in bankruptcy other than turning over what he happened to have in his

26

possession," the debtor's disclosure was not sufficient); In re Antoniou, 527 B.R. at 81. As the court stated in Union Planters Bank, N.A. v. Connors (In re Connors), 254 B.R. 230, 235 (Bankr. S.D. Ill. 2000), aff'd, 273 B.R. 764 (S.D. Ill. 2001), "[t]he burden is upon the debtor and not the creditor to organize and to reconstruct the debtor's business affairs." Other courts agree. See, e.g., In re Boyajian, 486 B.R. at 325; WTHW Inv. Builders v. Dias (In re Dias), 95 B.R. 419, 423 (Bankr. N.D. Tex. 1988).

Further, Shove's argument that the denial of his discharge amounts to a penalty for doing business on a cash basis is unpersuasive. It is not the cash basis of his dealings that is troubling but, rather, his failure and inability to account for the source and use of that cash. See Agai v. Antoniou (In re Antoniou), 515 B.R. 9, 21 (Bankr. E.D.N.Y. 2014) (granting summary judgment on a § 727(a)(3) claim where the debtor failed to produce records that provided "information about the source or use of the funds" deposited and withdrawn, and did not provide complete information regarding cash transactions). As one bankruptcy court recently stated:

> When . . . the bank statements a debtor produces for a business the debtor owns "do not identify the sources of deposits" and the debtor does not "provide cancelled checks corresponding to the transactions on the bank statements, it is impossible to ascertain the purposes for or disposition of funds withdrawn from the account." In addition, when a debtor cannot produce "even the most basic records" for a business he owns, such as "balance sheets or other accounting records," or complete bank statements for the business account, the debtor has not met his obligations under section 727(a)(3).

In re Neupmann, 2021 WL 5072010, at *6 (citations omitted). In light of the foregoing, the bankruptcy court appropriately found that Shove failed to furnish satisfactory written records regarding the rental activities associated with his properties.

Because we affirm the bankruptcy court's Judgment denying Shove's discharge under § 727(a)(3), we need not delve into the bankruptcy court's § 727(a)(4)(A) ruling and the concomitant evidentiary rulings challenged in this appeal. See Zizza v. Harrington (In re Zizza),

27

875 F.3d 728, 733 (1st Cir. 2017) (concluding it was unnecessary to consider alternative argument under § 727(a)(2) after affirming denial of discharge under § 727(a)(4)(A)); see also Yaquinto v. Ward (In re Ward), 978 F.3d 298, 305 (5th Cir. 2020) (stating it is only necessary to establish one ground under § 727(a) to deny discharge); Snyder v. Dykes (In re Dykes), 954 F.3d 1157, 1164 (8th Cir. 2020) (affirming denial of discharge under § 727(a)(3) without considering alternative rulings); Farouki v. Emirates Bank Int'l, Ltd., 14 F.3d 244, 250 (4th Cir. 1994) (stating "[a] party objecting to discharge need prove only one of the grounds . . . under § 727(a)").

## CONCLUSION

For the reasons discussed above, we **AFFIRM** the bankruptcy court's denial of Shove's discharge under § 727(a)(3). "Though the result may be harsh, '[c]omplete disclosure is in every case a condition precedent to the granting of the discharge, and [ ] such a disclosure is not possible without the keeping of books or records.'" In re Antoniou, 527 B.R. at 81 (citation omitted) (alteration in original). Kathleen's appeal is **DISMISSED** for lack of standing.